FILED

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2019 Grand Jury

| UNITED STATES OF AMERICA, | CR No. 17-00480(A)-PSG |
|---|---|
| Plaintiff, | F I R S T |
| v. | S U P E R S E D I N G |
| | I N D I C T M E N T |
| FRED MINASSIAN and FNU LNU, aka "Cindy," | |
| Defendants. | [21 U.S.C. § 846: Conspiracy to (1) Distribute and Possess with Intent to Distribute Controlled Substances, and (2) Acquire a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception, and Subterfuge; 18 U.S.C. § 371: Conspiracy to (1) Falsify, Conceal, and Cover Up a Material Fact Within Federal Jurisdiction, (2) Engage in Witness Tampering, and (3) Falsify Records; 18 U.S.C. § 3: Accessory After the Fact; 18 U.S.C. § 1001(a)(3): Making and Using a False Writing Containing False Statements Within Federal Jurisdiction; 18 U.S.C. § 1001(a)(2): False Statement to a Law Enforcement Officer; 18 U.S.C. § 1519: Falsification of Records; 18 U.S.C. § 2(a): Aiding and Abetting; 21 U.S.C. § 853: Criminal Forfeiture] |

1    The Grand Jury charges:

2                               COUNT ONE

3                            [21 U.S.C. § 846]

4                    [DEFENDANT FNU LNU aka CINDY]

5    **A.   OBJECTS OF THE CONSPIRACY**

6         Beginning on a date unknown, and continuing to a date not

7    earlier than July 27, 2017, in Los Angeles County, within the

8    Central District of California, and elsewhere, defendant FIRST

9    NAME UNKNOWN LAST NAME UNKNOWN, also known as "Cindy" ("CINDY"),

10   and others known and unknown to the Grand Jury, conspired with

11   each other to knowingly and intentionally commit one or more of

12   the following offenses:

13        1.   Distribution of oxycodone, a Schedule II narcotic drug

14   controlled substance, in violation of Title 21, United States

15   Code, Sections 841(a)(1), (b)(1)(C);

16        2.   Possession with intent to distribute oxycodone, a

17   Schedule II narcotic drug controlled substance, in violation of

18   Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

19        3.   Distribution of hydrocodone, a Schedule II narcotic

20   drug controlled substance, in violation of Title 21, United

21   States Code, Sections 841(a)(1), (b)(1)(C);

22        4.   Possession with intent to distribute hydrocodone, a

23   Schedule II narcotic drug controlled substance, in violation of

24   Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

25        5.   Distribution of amphetamine salts, a Schedule II

26   controlled substance, in violation of Title 21, United States

27   Code, Sections 841(a)(1), (b)(1)(C);

28

1    6.    Possession with intent to distribute amphetamine

2  salts, a Schedule II controlled substance, in violation of Title

3  21, United States Code, Sections 841(a)(1), (b)(1)(C);

4    7.    Distribution of alprazolam, a Schedule IV controlled

5  substance, in violation of Title 21, United States Code,

6  Sections 841(a)(1), (b)(2);

7    8.    Possession with intent to distribute alprazolam, a

8  Schedule IV controlled substance, in violation of Title 21,

9  United States Code, Sections 841(a)(1), (b)(2); and

10    9.    Acquiring a controlled substance by misrepresentation,

11  fraud, forgery, deception, and subterfuge, in violation of Title

12  21, United States Code, Section 843(a)(3).

13  B.   **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE**

14      **ACCOMPLISHED**

15      The objects of the conspiracy were to be accomplished, in

16  substance, as follows:

17    1.    Minas Matosyan ("Matosyan") would oversee sham medical

18  clinics throughout the greater Los Angeles area, for the purpose

19  of profiting from the sale of thousands of illegitimate

20  prescriptions (the "fraudulent prescriptions") for controlled

21  substances, including, oxycodone, hydrocodone, amphetamine

22  salts, and alprazolam.

23    2.    Armen Simonyan, Grisha Sayadyan, and Sabrina Guberman,

24  aka "Susie," would oversee the day-to-day management of the sham

25  clinics.

26    3.    Matosyan would retain corrupt doctors who, in turn,

27  would allow the conspirators to issue fraudulent prescriptions

28  in the corrupt doctors' names in exchange for kickbacks.

4.   Defendant CINDY, Matosyan, Simonyan, and Guberman would concoct lies to tell pharmacists in order to falsely conceal that the conspirators had created and sold prescriptions in the name of doctor E.S. ("E.S."), even though E.S. was hospitalized or deceased at the time the fraudulent prescriptions were issued.

5.   Matosyan, Ralph Manning ("R. Manning"), Hayk Matosyan ("H. Matosyan"), Simonyan, and Guberman would steal the identity of doctor L.G.W. ("L.G.W."), namely, by creating, selling, and filling fraudulent prescriptions and related medical paperwork purportedly written by L.G.W., without L.G.W.'s knowledge or authorization.

6.   Matosyan and R. Manning would instruct black market customers to provide them with the names and dates of birth that the customers wanted to be included as "patient" information on the fraudulent prescriptions.

7.   Matosyan, Simonyan, Sayadyan, and Guberman, and others acting at their direction, would provide false information to pharmacists, in response to inquiries from pharmacists seeking to verify fraudulent prescriptions prior to filling them.

8.   Matosyan, R. Manning, H. Matosyan, and Gary Henderson would sell bulk quantities of oxycodone, hydrocodone, and alprazolam pills to black market customers, including to co-conspirator Frederick Manning, Jr. ("F. Manning").

9.   Henderson, Marisa Montenegro, Elizabeth Gurumdzhyan ("E. Gurumdzhyan"), and Anait Guyumzhyan ("A. Guyumzhyan") would fill fraudulent prescriptions for oxycodone and other narcotics that they had acquired from Matosyan, Sayadyan, and Simonyan for

4

1  the purpose of acquiring bulk quantities of oxycodone to sell on

2  the black market.

3      10.  Defendant CINDY, Matosyan, F. Manning, Fred Minassian,

4  and Guberman would fraudulently cover up a law enforcement

5  seizure of hydrocodone pills ("the seized hydrocodone") by

6  arranging to falsely inform law enforcement that the seized

7  hydrocodone had been legitimately prescribed either to defendant

8  F. Manning or to another person.

9      11.  Defendant CINDY, Matosyan, F. Manning, Minassian, and

10  Guberman would attempt to persuade doctor N.D. ("N.D.") to

11  provide false information to law enforcement regarding the

12  seized hydrocodone.

13      12.  Defendant CINDY, Matosyan, F. Manning, Minassian, and

14  Guberman would arrange for a fraudulent medical letter to be

15  sent to law enforcement, which falsely represented that N.D. had

16  legitimately prescribed the seized hydrocodone to F. Manning

17  during a May 2016 medical visit.

18  C.  **OVERT ACTS**

19      In furtherance of the conspiracy and to accomplish the

20  objects of the conspiracy, on or about the following dates,

21  defendant CINDY, and others known and unknown to the Grand Jury,

22  committed various overt acts within the Central District of

23  California, and elsewhere, including, the following:

24  **January-February 2016 Sales of Oxycodone Prescriptions to CS-1**

25      1.  On January 21, 2016, using coded language in a

26  telephone conversation, Matosyan spoke with a person believed to

27  be a black market customer, but who was actually a confidential

28  source working with law enforcement ("CS-1"), and agreed to

speak with CS-1 on a later date to coordinate the sale of fraudulent oxycodone prescriptions to CS-1.

2.    On January 26, 2016, using coded language in a telephone conversation, Matosyan agreed to sell CS-1 a fraudulent prescription for oxycodone at the price of $200, and instructed CS-1 to contact R. Manning to provide information necessary to complete the prescription, including the type of drug being prescribed and the name and date of birth of the "patient" to be named on the prescription.

3.    On January 27, 2016, using coded language in two telephone conversations and a text message, Matosyan provided CS-1 with R. Manning's phone number and reiterated that CS-1 should provide R. Manning with the information necessary to complete the prescription.

4.    On January 27, 2016, using coded language in a telephone conversation, R. Manning confirmed to CS-1 that he (R. Manning) would complete the sale of the fraudulent prescription on Matosyan's behalf, and instructed CS-1 to send him via text message the "patient" name, "patient" date of birth, and drug types that CS-1 wanted to be written on the fraudulent prescription.

5.    On January 27, 2016, R. Manning received a coded text message from CS-1 that included a "patient" name and date of birth belonging to a false alias, and that also included instructions for the fraudulent prescription to include 150 pills of 30-mg oxycodone.

6.    On January 27, 2016, at a parking lot in Los Angeles, California, R. Manning delivered to CS-1 a prescription for 150

pills of 30-mg oxycodone issued under the name of doctor R.G.
("R.G.") to a "patient" with the name and date of birth provided
by CS-1, and accepted in return payment of $200 cash.

7.   On February 4, 2016, using coded language in a
telephone conversation, Matosyan agreed to sell three new
fraudulent oxycodone prescriptions to CS-1, and Matosyan
instructed CS-1 to contact R. Manning to arrange the
transaction, including for CS-1 to again provide R. Manning with
the names, dates of birth, and drug types and quantities for the
fraudulent prescriptions.

8.   On February 4, 2016, R. Manning received a coded text
message from CS-1 that included three different "patient" names
and dates of birth for the fraudulent prescriptions to be sold
to CS-1 during the upcoming transaction.

9.   On February 5, 2016, R. Manning received a coded text
message from CS-1 requesting that a new "patient" name be
included on one of the fraudulent prescriptions.

10.   On February 5, 2016, using coded language in a text
message, R. Manning confirmed for CS-1 that he would change the
name of the "patient" on one of the prescriptions as requested
by CS-1.

11.   On February 5, 2016, in a parking lot in Los Angeles,
California, R. Manning delivered to CS-1 three prescriptions,
each for 150 pills of 30 mg oxycodone, issued under the name of
R.G. to "patients" with the names and dates of birth provided by
CS-1, and in return accepted payment of $600 cash.

12.   On February 24, 2016, using coded language in a
telephone conversation, Matosyan agreed to sell CS-1 three new

oxycodone prescriptions, and instructed CS-1 to provide R.
Manning with the information necessary to complete the
fraudulent prescriptions.

13.   On February 24, 2016, using coded language in a
telephone conversation, Matosyan informed CS-1 that he would be
able to sell prescriptions to CS-1 under a new doctor's name
when his new clinic opened.

14.   On February 24, 2016, using coded language in a
telephone conversation, R. Manning instructed CS-1 to send him
the names and dates of birth to include on the fraudulent
prescriptions he was preparing for CS-1, after which CS-1 texted
three different "patient" names and dates of birth to R.
Manning.

15.   On February 24, 2016, at a convenience store parking
lot in Los Angeles, California, R. Manning delivered to CS-1
three prescriptions, each for 150 pills of 30 mg oxycodone,
issued under the name of R.G. to "patients" with the names and
dates of birth provided by CS-1, and in return accepted payment
of $600.

**Prescriptions Issued in the Name of Deceased Doctor E.S.**

April 27, 2016 Conversation between Matosyan and Defendant CINDY

16.   On April 27, 2016, using coded language in a telephone
conversation, defendant CINDY informed Matosyan that, according
to an unidentified female conspirator ("UF-1"), pharmacists had
called one of their medical clinics to verify prescriptions
issued in the name of E.S., which posed a problem because E.S.
was dead on the date when the fraudulent prescriptions had been
issued under E.S.'s name.

17.   On April 27, 2016, using coded language in a telephone conversation, Matosyan instructed defendant CINDY to warn UF-1 that if any pharmacists learned that prescriptions had been issued in the name of E.S. while he was hospitalized or after his death, "the first thing that they're going to do is call and tell the police that she billed under a doctor that was in the hospital and wrote prescriptions for a doctor in the hospital, so the first person who is going to be going to jail for life is her."

18.   On April 27, 2016, using coded language in a telephone conversation, Matosyan informed defendant CINDY that, when pharmacists call UF-1 to verify a prescription issued under E.S.'s name, UF-1 must falsely respond that E.S. is working at another location and therefore was unavailable to speak with the pharmacist.

19.   On April 27, 2016, using coded language in a telephone conversation, Matosyan informed defendant CINDY about a conversation that Matosyan previously had with UF-1's husband, during which Matosyan reminded UF-1's husband that he (Matosyan) had provided to UF-1's husband a corrupt doctor ("Corrupt Doctor 1") to use as part of a corrupt medical practice, that Corrupt Doctor 1 was "worth $120,000" in criminal proceeds to UF-1's husband, and that UF-1's husband needed to "pay me (Matosyan) my fucking money right now" as compensation for Matosyan providing Corrupt Doctor 1 to UF-1's husband.

20.   On April 27, 2016, using coded language in a telephone conversation, defendant CINDY informed Matosyan that she had also spoken to UF-1 and that UF-1 said that Matosyan could take

9

back Corrupt Doctor 1, to which Matosyan responded, "I don't give a fuck.  Doctors are like underwear to me: I don't take back used things.  You understand?  This isn't the way the world works."

21.  On April 27, 2016, using coded language in a telephone conversation, at Matosyan's request, defendant CINDY agreed to create fraudulent patient records under E.S.'s name.

<u>May 12, 2016 Sale of Oxycodone Prescriptions to CS-1</u>

22.  On May 12, 2016, using coded language in a telephone conversation, Matosyan agreed to sell additional fraudulent prescriptions to CS-1.

23.  On May 12, 2016, in a grocery store parking lot in Encino, California, Matosyan delivered to CS-1 two blank prescriptions under the name of E.S. and two blank prescriptions under the name of R.G., in exchange for which Matosyan received $400 cash from CS-1.

24.  On May 12, 2016, in a grocery store parking lot in Encino, California, Matosyan instructed CS-1 to contact R. Manning to purchase two additional prescriptions.

25.  On May 12, 2016, in a grocery store parking lot in Encino, California, Matosyan invited CS-1 to bring recruited patients to Matosyan's new clinic and to work at the clinic in exchange for payment in the form of both money and fraudulent prescriptions.

26.  On May 12, 2016, using coded language in a telephone conversation, R. Manning agreed to meet with CS-1 later that day and to deliver additional fraudulent prescriptions to CS-1.

27.  On May 12, 2016, in a parking lot in Los Angeles, California, R. Manning delivered to CS-1 two prescriptions, each for 120 pills of 30 mg oxycodone, issued under the name of E.S. to "patients" in names and dates of birth previously provided to R. Manning by CS-1.

28.  On May 12, 2016, in a parking lot in Los Angeles, California, R. Manning, after being informed by CS-1 that the prescriptions that R. Manning just delivered to CS-1 were unsigned, retrieved a pen and forged E.S.'s signature on both prescriptions.

### Additional Intercepted Communications about E.S.

29.  On April 28, 2016, using coded language in a telephone conversation, after being told by an unidentified customer that some pharmacies had refused to fill prescriptions because E.S. was deceased on the date the prescriptions purportedly were issued by him, Matosyan agreed to deliver a new set of fraudulent prescriptions to the customer later that day.

30.  On May 4, 2016, using coded language in a telephone conversation, Simonyan informed Matosyan that some of their employees became frightened on learning that prescriptions had been issued in the name of a deceased doctor.

31.  On May 6, 2016, using coded language in a telephone conversation, Guberman warned Matosyan that a Costco pharmacy repeatedly had called one of their medical clinics to inquire about E.S. prescriptions that a customer was attempting to fill, and Guberman warned Matosyan to instruct the customer not to bring other E.S. prescriptions to the Costco pharmacy or the customer likely would be arrested.

32.   On May 19, 2016, using coded language in a telephone conversation, Matosyan told an unindicted co-conspirator that he (Matosyan) planned on opening a new medical office, that the new office would issue prescriptions in the name of E.S. even though E.S. was deceased, and that Matosyan had employees at the office who would fraudulently verify the prescriptions in response to inquiries by pharmacists.

### Identity Theft of L.G.W.

Matosyan Attempts to Recruit L.G.W. and Arranges to Produce
Prescription Pads in L.G.W.'s Name

33.   On May 16, 2016, using coded language in two telephone conversations, Matosyan and an unidentified conspirator discussed Matosyan's plan to recruit L.G.W. to work at one of Matosyan's medical offices, and Matosyan asked the conspirator to provide him (Matosyan) with L.G.W.'s personal information including his medical license number, telephone number, and national provider identifier ("NPI") number.

34.   On May 19, 2016, using coded language in a telephone conversation, Matosyan offered L.G.W. a "very lucrative" position working for Matosyan in which L.G.W. would "sit home making $20,000 a month doing nothing," which L.G.W. declined to accept.

35.   On May 24, 2016, using coded language in a telephone conversation and text message, Matosyan sent L.G.W.'s personal information, including his full name, medical license number, and NPI number, to an unidentified conspirator, and Matosyan confirmed that the conspirator would obtain a prescription pad in L.G.W.'s name at a printing shop in Hollywood, California.

1          Matosyan Sells an L.G.W. Oxycodone Prescription

2          to UM-1 and Arranges to Deceive a Pharmacist

3      36.  On June 8, 2016, using coded language in a series of

4  telephone conversations and text message, Matosyan arranged to

5  deliver to an unidentified male customer ("UM-1") an L.G.W.

6  prescription for 150 pills of oxycodone and 90 pills of

7  alprazolam, and UM-1 provided Matosyan with the "patient" name

8  and date of birth to include on the prescription.

9      37.  On June 8, 2016, in Encino, California, Matosyan

10  delivered to UM-1 an L.G.W. prescription for oxycodone and

11  hydrocodone.

12      38.  On June 8, 2016, using coded language in two telephone

13  conversations, Matosyan, after being advised by UM-1 that the

14  L.G.W. prescription that Matosyan just delivered included

15  hydrocodone rather than alprazolam, agreed to meet with UM-1 to

16  deliver a corrected prescription.

17      39.  On June 9, 2016, using coded language in a telephone

18  conversation, Matosyan spoke with UM-1 about how a pharmacist

19  was going to contact Matosyan's office to verify the L.G.W.

20  prescription, and that the pharmacist did not need to speak with

21  L.G.W. but would need to obtain medical paperwork in support of

22  the prescription.

23      40.  On June 10, 2016, using coded language in a telephone

24  conversation, Guberman informed Matosyan that Matosyan needed to

25  sign fraudulent medical paperwork in the name of patient T.B.

26  (the "patient" name on the fraudulent prescription that Matosyan

27  delivered to UM-1 two days earlier), and Matosyan agreed to meet

28  Guberman at a medical office to do so.

1        Matosyan Sells L.G.W. Oxycodone Prescriptions to UF-2

2        41.  On June 8, 2016, using coded language in a telephone
3   conversation, Matosyan agreed to sell prescriptions at a cost of
4   $200 each to an unidentified female customer ("UF-2") who called
5   on behalf of F. Manning seeking to purchase four to five
6   fraudulent prescriptions.

7        42.  On June 8, 2016, using coded language in a telephone
8   conversation, Matosyan agreed to send UF-2 the name and federal
9   controlled drug registration number of the doctor who would be
10  named on the fraudulent prescriptions, so that UF-2 could
11  attempt to verify whether the doctor was the subject of any
12  investigation by law enforcement.

13       43.  On June 8, 2016, Matosyan sent to UF-2 a text message
14  that included L.G.W.'s name, NPI number, medical license number,
15  and federal controlled drug registration number.

16       44.  On June 17, 2016, using coded language in a telephone
17  conversation, Matosyan agreed to meet UF-2 later that day to
18  complete the oxycodone transaction and further advised UF-2 to
19  avoid filling the fraudulent prescriptions at a major chain
20  pharmacy such as a Walgreens pharmacy, which Matosyan said were
21  more likely to want to contact the prescribing physician to
22  verify the fraudulent prescriptions.

23       45.  On June 17, 2016, using coded language in a series of
24  text messages, UF-2, acting at Matosyan's direction, provided
25  Matosyan with three different "patient" names and dates of birth
26  to use in writing the fraudulent prescriptions to be sold to UF-
27  2 later that day.

28

1    46.   On June 17, 2016, Matosyan delivered three

2    prescriptions, each for 150 pills of 30-mg oxycodone, issued

3    under L.G.W.'s name to the "patient" names and dates of birth

4    previously provided by UF-2.

5    <u>Matosyan Delivers L.G.W. Oxycodone Prescriptions to Henderson</u>

6    47.   On June 23, 2016, using coded language in a telephone

7    conversation, Matosyan agreed to deliver fraudulent oxycodone

8    prescriptions to Henderson later that day.

9    48.   On June 23, 2016, using coded language in a series of

10   text messages, Henderson sent four different "patient" names and

11   dates of birth to use in writing the fraudulent oxycodone

12   prescriptions, and Matosyan confirmed that he (Matosyan) would

13   deliver the fraudulent prescriptions to Henderson within the

14   next hour.

15   49.   On June 23, 2016, using coded language in two

16   telephone conversations, Matosyan and Henderson discussed how

17   fraudulent prescriptions should be written for oxycodone at 30-

18   mg strength and the phone number that should be provided to

19   pharmacists who wanted to verify a fraudulent prescription.

20   50.   On June 23, 2016, at a parking lot in Encino,

21   California, Matosyan delivered four fraudulent prescriptions,

22   each for 150 pills of 30-mg oxycodone, to Henderson, with each

23   issued under L.G.W.'s name and for "patients" with the names and

24   dates of birth previously provided by Henderson

25   51.   On June 23, 2016, using coded language in two

26   telephone conversations, Henderson informed Matosyan that law

27   enforcement conducted a traffic stop of Henderson's car and

28

1  seized the four oxycodone prescriptions that Matosyan had just
2  delivered to Henderson.

3  Matosyan, R. Manning, and H. Matosyan Fill a Fraudulent L.G.W.
4  Prescription and Deliver Oxycodone Pills

5  52.  On June 17, 2016, using coded language in a series of
6  telephone conversations, H. Matosyan agreed to assist R. Manning
7  in filling a prescription issued under L.G.W.'s name at a
8  pharmacy in Encino, California, and Matosyan agreed to give H.
9  Matosyan the fraudulent prescription to be filled at the
10  pharmacy and cash to pay for the cost of filling the
11  prescription.

12  53.  On June 17, 2016, at a pharmacy in Encino, California,
13  R. Manning and H. Matosyan attempted to fill a fraudulent
14  prescription issued under L.G.W.'s name for oxycodone,
15  hydrocodone, and alprazolam.

16  54.  On June 17, 2016, using coded language in a telephone
17  conversation, H. Matosyan told Matosyan that the pharmacy had
18  only 20 pills of oxycodone available, and thus could only
19  partially fill the fraudulent prescription that R. Manning and
20  H. Matosyan had presented.

21  55.  On June 17, 2016, using coded language in a telephone
22  conversation, Matosyan arranged for an unidentified male drug
23  customer ("UM-2") to meet H. Matosyan later that day, so that H.
24  Matosyan would deliver 20 pills of oxycodone to UM-2.

25  56.  On June 17, 2016, using coded language in a series of
26  telephone conversations, H. Matosyan agreed to deliver 20 pills
27  of oxycodone to UM-2 later that day at a restaurant in Sherman
28  Oaks, California.

57.   On June 17, 2016, using coded language in a telephone conversation, H. Matosyan confirmed to Matosyan that he delivered 20 pills of oxycodone to UM-2.

58.   On June 20, 2016, using coded language in a series of telephone conversations, H. Matosyan confirmed that he and R. Manning would pick up 130 pills of oxycodone from the pharmacy in Encino, California, which represented the unfilled portion of the L.G.W. prescription that H. Matosyan and R. Manning had attempted to fill at the pharmacy three days earlier.

59.   On June 20, 2016, using coded language in a telephone conversation, R. Manning agreed that he, H. Matosyan, and an unidentified co-conspirator would pick up the remaining 130 pills of oxycodone and deliver them to UM-2, and Matosyan confirmed that UM-2 would have money on hand to complete the transaction.

60.   On June 20, 2016, using coded language in two telephone conversations, Matoysan confirmed that UM-2 would meet with H. Matosyan later that day to purchase 130 pills of oxycodone, and Matosyan told UM-2 to provide H. Matosyan with names to include as "patients" for future fraudulent prescriptions.

61.   On June 20, 2016, using coded language in a telephone conversation, H. Matosyan informed Matosyan that the pharmacy had not yet received an expected wholesale shipment of oxycodone pills and that a pharmacy employee would notify H. Matosyan when the pharmacy had the remaining 130 pills of oxycodone in stock.

62.   On June 27, 2016, using coded language in a telephone conversation, R. Manning told Matosyan that he (R. Manning) was

aware of people who could purchase L.G.W. controlled drug

prescriptions, and Matosyan agreed to sell the prescriptions but

stressed the need for R. Manning to instruct the potential

customers to take the prescriptions to pharmacies that would

fill the L.G.W. prescriptions without verifying them.

### R. Manning and Simonyan Fill L.G.W. Prescriptions

63. On June 27, 2016, Simonyan, using the alias "Richard

Simonson," filled a prescription issued under L.G.W.'s name for

oxycodone.

64. On July 20, 2016, R. Manning filled prescriptions

issued under L.G.W.'s name for oxycodone, hydrocodone, and

alprazolam.

65. On July 27, 2016, Simonyan, using the alias "Richard

Simonson," filled a prescription issued under L.G.W.'s name for

oxycodone.

66. On August 25, 2016, R. Manning filled prescriptions

issued under L.G.W.'s name for oxycodone, hydrocodone, and

alprazolam.

67. On September 20, 2016, R. Manning filled prescriptions

issued under L.G.W.'s name for oxycodone, hydrocodone, and

alprazolam.

68. On October 19, 2016, R. Manning filled prescriptions

issued under L.G.W.'s name for oxycodone, hydrocodone, and

alprazolam.

### Seizure of Hydrocodone from F. Manning and
### Conspiracy to Provide Fraudulent Records to Law Enforcement

69. On May 18, 2016, using coded language in a series of

telephone conversations, Matosyan and Henderson arranged to meet

in Encino, California to deliver 500 pills of oxycodone and hydrocodone to F. Manning.

70.  On May 18, 2016, using coded language in two telephone conversations, Matosyan arranged to deliver 500 pills of oxycodone and hydrocodone to F. Manning in exchange for $1,600, and Matosyan confirmed that Henderson could sell 1,000 pills per week of narcotics to F. Manning in future transactions.

71.  On May 18, 2016, in Encino, California, Matosyan and Henderson delivered 500 pills of oxycodone and hydrocodone to F. Manning.

72.  On May 18, 2016, using coded language in a telephone conversation, F. Manning reported to Matosyan that a law enforcement officer had pulled over F. Manning's car for a traffic violation, and had seized 140 pills of hydrocodone ("the seized hydrocodone"), but that the officer did not find the additional oxycodone pills that Matosyan and Henderson had also just delivered to F. Manning.

73.  On May 18, 2016, using coded language in a telephone conversation, F. Manning told Matosyan that F. Manning had falsely told the officer conducting the traffic stop that the seized hydrocodone had been legitimately prescribed to F. Manning by R.G.

74.  On May 18, 2016, using coded language in a telephone conversation, Matosyan assured F. Manning that Matosyan would be able to fraudulently cover up the drug seizure by obtaining a letter from a doctor purporting that the doctor had legitimately prescribed the seized hydrocodone to F. Manning because, for $200, the doctor would "do whatever the hell we want him to."

75.   On June 10, 2016, using coded language in a telephone conversation, Matosyan told defendant CINDY that Matosyan, F. Manning, and Minassian had met and created a plan to fraudulently cover up the seizure of the hydrocodone pills.

76.   On June 10, 2016, using coded language in a telephone conversation, Matosyan informed defendant CINDY that Matosyan, F. Manning, and Minassian agreed that an unidentified female "patient" ("UF-3") would falsely claim to law enforcement that the seized hydrocodone had been legitimately prescribed to her, and that UF-3 would falsely claim that she had accidentally left the seized hydrocodone in F. Manning's car.

77.   On June 10, 2016, using coded language in a telephone conversation, defendant CINDY and Matosyan discussed the cover-up plan regarding UF-3.   Defendant CINDY said that she thought the plan was "good" "as long as each party is willing, at any point, to get up and say 100 percent even if they have to go to court."   Matosyan responded that that was not a problem because UF-3 would "do whatever we tell her to do" and that he planned to pay $700 to UF-3, $500 to the doctor, and $200 to the doctor's receptionist for "the paperwork."

78.   On June 10, 2016, using coded language in a telephone conversation, Matosyan informed defendant CINDY that, according to Minassian, law enforcement would not attempt to conduct follow-up investigation upon receiving a doctor's letter fraudulently claiming to have legitimately prescribed the seized hydrocodone to UF-3.

79.   On June 21, 2016, F. Manning spoke with a law enforcement officer, during which F. Manning stated that F.

Manning's attorney (Minassian) would be providing the law enforcement officer with a doctor's letter regarding the seized hydrocodone.

80. On June 21, 2016, using coded language in a telephone conversation, F. Manning informed Matosyan that a law enforcement officer had just contacted him to obtain a copy of medical paperwork regarding the seized hydrocodone, and Matosyan agreed to have the fraudulent medical records ready by the end of the week.

81. On June 21, 2016, using coded language in a telephone conversation, Matosyan agreed to meet with F. Manning and Minassian to discuss how to respond to law enforcement regarding the seized hydrocodone, and F. Manning stated that Minassian no longer believed that Matosyan's plan (claiming that the seized hydrocodone had been prescribed to UF-3) would persuade law enforcement.

82. On June 22, 2016, using coded language in a telephone conversation, Matosyan instructed F. Manning to have defendant CINDY bring a magnetic resonance imaging report to Matosyan, and that Matosyan would use the report to generate a fraudulent medical record to send to law enforcement regarding the seized hydrocodone.

83. On June 29, 2016, using coded language in a telephone conversation, Minassian instructed Matosyan to falsely state, in a fraudulent medical letter that Matosyan would create, that the seized hydrocodone had been prescribed to F. Manning by a doctor to treat back pain during a medical examination on May 10, 2016.

84.   On July 1, 2016, Minassian sent a fax to law enforcement that included a fraudulent medical letter under N.D.'s name, which falsely claimed that N.D. prescribed 150 pills of hydrocodone to F. Manning during a medical examination on May 10, 2016.

85.   On July 6, 2016, using coded language in a telephone conversation, Guberman informed Matosyan that a law enforcement officer had contacted N.D. directly, during which N.D. told the law enforcement officer that N.D. had never seen F. Manning as a patient and did not prescribe hydrocodone to F. Manning, and that Simonyan was angry as a result of the law enforcement officer's unexpected call to N.D.

86.   On July 6, 2016, using coded language in a telephone conversation, Guberman informed Matosyan that it was too late to attempt to persuade N.D. to contact the law enforcement officer to falsely "verify" that N.D. had prescribed the seized hydrocodone to F. Manning, and suggested that she (Guberman) would find a different doctor who would falsely verify prescribing hydrocodone to F. Manning and would provide fraudulent supporting medical paperwork.

87.   On July 6, 2016, using coded language in a telephone conversation, Matosyan and Guberman discussed whether N.D. would accept a bribe of $2,000 to retract his statement to law enforcement and to falsely confirm that N.D. had prescribed the seized hydrocodone to F. Manning.

88.   On July 6, 2016, using coded language in a telephone conversation, Matosyan informed defendant CINDY that "the problem is fixable" and that Matosyan would visit N.D. the

22

following morning to persuade N.D. to falsely retract his prior statement to law enforcement.

89.  On July 6, 2016, using coded language in a series of telephone conversations, Guberman informed Matosyan that an unidentified female ("UF-4") worked at a doctor's office, and that UF-4 could help Matosyan in creating fraudulent paperwork regarding the seized hydrocodone in exchange for $3,000.

90.  On July 6, 2016, using coded language in a telephone conversation, Matosyan informed Simonyan that upcoming sales of fraudulent prescriptions needed to be postponed because of the law enforcement investigation into the seized hydrocodone, and that it would cost $3,500 to complete the fraudulent cover-up of the hydrocodone seizure, including $500 that would be paid to Guberman; Simonyan responded that F. Manning was wealthy and should be required to reimburse the $3,500.

91.  On July 6, 2016, using coded language in a telephone conversation, Matosyan informed Minassian that a law enforcement officer called N.D. and that N.D. denied prescribing the seized hydrocodone to F. Manning, at which time Matosyan chastised Minassian for rejecting his original plan of claiming that the seized hydrocodone had been prescribed to UF-3.

92.  On July 6, 2016, using coded language in a telephone conversation, Minassian stated that he (Minassian) assumed that N.D. was "on board" when Minassian agreed to send the fraudulent letter under N.D.'s name to law enforcement, to which Matosyan responded that N.D. was "not on board;" Minassian stated that he (Minassian) would attempt to come up with an alternative plan and would contact Matosyan later.

93.   On July 6, 2016, using coded language in a telephone conversation, Matosyan and F. Manning discussed how F. Manning and Minassian had rejected Matosyan's original plan to use UF-3 to cover up the seized hydrocodone, how Minassian had devised the alternative plan of falsely claiming that the seized hydrocodone had been prescribed to F. Manning rather than to UF-3, and how F. Manning had miscalculated when he promised that law enforcement would not attempt to verify the fraudulent medical documentation, and F. Manning stated that he (F. Manning) would be "locked up" as a result of Matosyan's failure to stop the law enforcement investigation.

94.   On July 6, 2016, using coded language in a telephone conversation, Matosyan and defendant CINDY discussed whether they could attempt to bribe the law enforcement officers investigating the hydrocodone seizure to stop the investigation from continuing.

95.   On July 6, 2016, using coded language in a telephone conversation, Minassian told Matosyan that he (Minassian) had asked F. Manning to provide "a letter from a doctor, any doctor" falsely purporting to verify the prescription, and the two then agreed that Matosyan would attempt to bribe N.D. to fraudulently claim that N.D. had prescribed the seized hydrocodone to F. Manning.

96.   On July 6, 2016, Minassian spoke with a law enforcement officer, during which Minassian falsely claimed that he was not aware that N.D. had denied writing the letter that Minassian had sent to law enforcement on July 1, 2016, that Minassian had been told by F. Manning that the seized

24

hydrocodone was legitimately prescribed to F. Manning by N.D., and that Minassian believed that the letter was genuine when Minassian sent it to law enforcement.

97.  On July 6, 2016, using coded language in a telephone conversation, Matosyan informed F. Manning that he (Matosyan) and defendant CINDY would try to convince N.D. to falsely tell law enforcement that N.D. prescribed the seized hydrocodone to F. Manning.

98.  On July 6, 2016, using coded language in two telephone conversations and a text message, Matosyan arranged for UF-4 to generate fraudulent medical records reflecting that an unidentified doctor prescribed the seized hydrocodone to F. Manning.

99.  On July 6, 2016, using coded language in a telephone conversation, Guberman confirmed for Matosyan that UF-4 would be able to generate fraudulent medical paperwork regarding the seized hydrocodone.

100. On July 6, 2016, using coded language in a telephone conversation, Matosyan told defendant CINDY that he planned to continue trying to convince N.D. to inform law enforcement that N.D. had prescribed the seized hydrocodone to F. Manning, and that he had developed a back-up plan in the event that N.D. did not agree to do so, at which time defendant CINDY offered to join Matosyan in persuading N.D. to lie to law enforcement about the seized hydrocodone.

101. On July 7, 2016, using coded language in a telephone conversation, Matosyan assured F. Manning that he (Matosyan) had spoken to N.D. three times earlier that day and that Matosyan

1  was intent on convincing N.D. to lie to law enforcement about
2  the seized hydrocodone.

3      102. On August 26, 2016, Minassian falsely assured a law
4  enforcement officer that F. Manning was being honest in claiming
5  that the seized hydrocodone had been legitimately prescribed to
6  F. Manning by a doctor, and further falsely claimed that N.D.
7  was confused in previously denying that he (N.D.) prescribed the
8  seized hydrocodone to F. Manning.

9  **Additional Overt Acts**

10  Matosyan

11      103. On May 3, 2016, using coded language in a telephone
12  conversation, Matosyan confirmed that an unidentified female
13  conspirator ("UF-5") would provide him with an unspecified
14  number of 30-mg oxycodone pills at a price of $15 per pill.

15      104. On June 22, 2016, using coded language in a telephone
16  conversation, Matosyan confirmed that an unindicted co-
17  conspirator was at a print shop purchasing 100 prescription pads
18  under R.G.'s name, and Matosyan provided the serial numbers to
19  be printed on the prescriptions.

20      105. On June 22, 2016, using coded language in a telephone
21  conversation, Matosyan agreed to supply a fraudulent
22  prescription for 120 pills of amphetamine salts for an
23  unidentified male customer ("UM-3"), and further instructed UM-3
24  to make sure that the "patient" named on the prescription was
25  young to help ensure that a pharmacy would fill the
26  prescription.

27      106. On June 29, 2016, using coded language in a telephone
28  conversation, Matosyan contacted F. Manning to broker a drug

transaction, in which F. Manning would purchase 1,000 pills of 30-mg oxycodone and 1,000 pills of 10-mg hydrocodone from an unidentified co-conspirator, and which F. Manning agreed to carry out.

Simonyan

107. On June 13, 2016, using coded language in a telephone conversation, Matosyan and Simonyan discussed how Matosyan was arranging to hire a new doctor, who would issue fraudulent prescriptions to 20 patients per day, two to three times per week, at a price of $300 per prescription, and Matosyan and Simonyan agreed that they could place the doctor's actual information on the header of prescriptions because the doctor was aware that the prescriptions were fraudulent and would "verify" these prescriptions to any pharmacist who inquired about their authenticity.

108. On June 29, 2016, using coded language in a telephone conversation, Simonyan, after being told by Matosyan that the female receptionists working under Simonyan's authority needed to do a better job in fraudulently verifying prescriptions in response to inquiries from pharmacists, responded that Matosyan should provide him with more capable employees.

109. On June 29, 2016, using coded language in a telephone conversation, Matosyan and Simonyan discussed how several of Simonyan's customers were under investigation by law enforcement, with Matosyan agreeing to obtain for Simonyan a list of the names of the customers who were being investigated.

110. On July 1, 2016, using coded language in a telephone conversation, Simonyan informed Matosyan that he (Simonyan) was

1 going to a printing shop to obtain new prescription pads, and
2 Matosyan agreed that Simonyan should do so because Matosyan was
3 about to sell his remaining prescriptions.

Sayadyan

5     111. On October 14, 2016, using coded language in a series
6 of text messages, Sayadyan agreed to sell 100 pills of oxycodone
7 to an unidentified female customer ("UF-6") in exchange for $15
8 per pill.

9     112. On October 14, 2016, using coded language in a text
10 message, Sayadyan agreed to deliver 100 pills of oxycodone to
11 UF-6 later that day in Van Nuys, California.

12     113. On October 25, 2016, using coded language in a series
13 of text messages, Sayadyan and UF-6 discussed a future
14 transaction involving 100 pills of 30-mg oxycodone.

15     114. On November 11, 2016, using coded language in a series
16 of text messages, Sayadyan arranged to meet with UF-6, so that
17 UF-6 could deliver the $600 owed to Sayadyan from a prior drug
18 transaction.

19     115. On December 15, 2016, using coded language in a series
20 of text messages, Sayadyan arranged to sell 400 pills of 30-mg
21 oxycodone to UF-6 at the price of $15 per pill.

22     116. On January 2, 2017, using coded language in a text
23 message, Sayadyan agreed to sell 90 pills of 30-mg oxycodone to
24 UF-6 later that day in Burbank, California.

25     117. On January 10, 2017, using coded language in a series
26 of text messages, Sayadyan arranged to sell 120 pills of 30-mg
27 oxycodone to UF-6.

28

118. On March 8, 2017, using coded language in a series of text messages, Sayadyan arranged to sell 80 pills of 30-mg oxycodone to UF-6.

### Guberman

119. On June 17, 2016, using coded language in a telephone conversation, Guberman told Matosyan that new "patients" needed to be instructed to notify Guberman before bringing fraudulent prescriptions to pharmacies, so that Guberman could prepare to falsely "verify" the fraudulent prescriptions should there be a pharmacist inquiry.

120. On June 20, 2016, using coded language in a telephone conversation, Guberman asked Matosyan whether H. Matosyan could forge a doctor's signature on medical paperwork regarding fraudulent prescriptions for oxycodone and alprazolam to an unidentified customer, and Guberman and Matosyan agreed that Simoynan would forge the signature on the paperwork instead.

121. On July 6, 2016, using coded language in a telephone conversation, Guberman told Matosyan that she would call a pharmacy to falsely verify a fraudulent prescription for oxycodone and alprazolam sold to a customer.

122. On July 6, 2016, using coded language in a telephone conversation, Guberman reported to Matosyan that a pharmacy refused to fill a customer's fraudulent prescription, and Matosyan responded that Guberman should advise the customer to take the fraudulent prescription to a different pharmacy.

123. On July 6, 2016, using coded language in a telephone conversation, Guberman asked Matosyan to give her a fraudulent prescription for unspecified drugs for which she could provide a

1  false "patient" name and date of birth to use in completing the
2  prescription, which Matosyan agreed to do at his residence.

3  Montenegro

4      124. On October 6, 2015, Montenegro attempted to fill a
5  fraudulent prescription for oxycodone at a pharmacy in Thousand
6  Oaks, California.

7      125. On October 21, 2015, Montenegro arranged for a third
8  party "patient" to fill a fraudulent prescription for oxycodone
9  at a pharmacy in Thousand Oaks, California.

10     126. On October 23, 2015, Montenegro arranged for a third
11 party "patient" to fill a fraudulent prescription for oxycodone
12 at a pharmacy in Moorpark, California.

13     127. On November 13, 2015, at locations including her
14 residence in West Hills, California, and her vehicle, Montenegro
15 possessed, among other things, approximately $70,000 in cash
16 proceeds, multiple oxycodone prescriptions to various third
17 party "patients," and patient "profiles" in the names of third
18 parties, namely, copies of driver's licenses and Medicare and/or
19 Medi-Cal cards in third party names.

20 E. Gurumdzhyan and A. Guyumzhyan

21     128. On December 15, 2015, E. Gurumdzhyan attempted to fill
22 a fraudulent prescription for oxycodone at a pharmacy in Simi
23 Valley, California.

24     129. On December 18, 2015, E. Gurumdzhyan and A. Guyumzhyan
25 traveled to the pharmacy in Simi Valley, California, in a
26 further attempt to obtain oxycodone pills based on the
27 fraudulent oxycodone prescription that E. Gurumdzhyan had
28 attempted to fill three days earlier.

30

130. On December 21, 2015, E. Gurumdzhyan filled a fraudulent oxycodone prescription in a third party name at a pharmacy in Thousand Oaks, California.

131. On December 23, 2015, at locations including their residence in Los Angeles, California, E. Gurumdzhyan and A. Guyumzhyan possessed, among other things, multiple oxycodone prescriptions in the names of various third party "patients;" multiple signed oxycodone prescriptions for which the patient name, date of birth, and issuing date was left blank; patient "profiles" in third party names; 39 pills of alprazolam bearing a label reflecting that the prescription had been issued to a third party "patient;" and approximately $6,122 in cash proceeds.

COUNT TWO

[18 U.S.C. § 371]

[ALL DEFENDANTS]

**A.   INTRODUCTORY ALLEGATIONS**

At times relevant to this First Superseding Indictment:

1.   Defendant FRED MINASSIAN was an attorney who was licensed to practice law in the State of California.

2.   On May 18, 2016, in Encino, California, Minas Matosyan and Gary Henderson sold approximately 140 pills of hydrocodone to Frederick Manning, Jr.

3.   On May 18, 2016, after F. Manning purchased the hydrocodone, F. Manning was stopped by law enforcement in his vehicle, and law enforcement seized the approximately 140 pills of hydrocodone ("the seized hydrocodone").

**B.   OBJECTS OF THE CONSPIRACY**

4.   Beginning on or about May 18, 2016, and continuing to a date not earlier than August 26, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants MINASSIAN and FIRST NAME UNKNOWN LAST NAME UNKNOWN, also known as "Cindy" ("CINDY"), along with Matosyan, F. Manning, Sabrina Guberman, and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally commit one or more of the following offenses:

a.   Falsifying, concealing, and covering up by any trick, scheme, and device a material fact in a matter within the jurisdiction of the executive branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(1);

          b.    Making a false, fictitious, and fraudulent
statement and representation in a matter within the jurisdiction
of the executive branch of the United States, in violation of
Title 18, United States Code, Section 1001(a)(2);

          c.    Making and using any false writing and document
containing any materially false, fictitious, and fraudulent
statement and entry in a matter within the jurisdiction of the
executive branch of the United States, in violation of Title 18,
United States Code, Section 1001(a)(3);

          d.    Witness tampering, in violation of Title 18,
United States Code, Section 1512(b)(3); and

          e.    Falsification of records, in violation of
Title 18, United States Code, Section 1519.

C.    **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
      ACCOMPLISHED**

     5.    The objects of the conspiracy were to be accomplished,
in substance, as follows:

          a.    Defendants MINASSIAN and CINDY, along with
Matosyan, F. Manning, and Guberman, would cover up a law
enforcement seizure of the seized hydrocodone by arranging to
falsely inform law enforcement that the seized hydrocodone had
been legitimately prescribed either to defendant F. Manning or
to another person.

          b.    Defendants MINASSIAN and CINDY, along with
Matosyan, F. Manning, and Guberman, would attempt to persuade
doctor N.D. ("N.D.") to provide false information to law
enforcement regarding the seized hydrocodone.

1           c.    Defendants MINASSIAN and CINDY, along with

2   Matosyan, F. Manning, and Guberman, would arrange for a false

3   medical letter to be sent to law enforcement, which

4   misrepresented that N.D. had legitimately prescribed the seized

5   hydrocodone to F. Manning during a May 2016 medical visit.

6   D.   **OVERT ACTS**

7        6.    In furtherance of the conspiracy and to accomplish the

8   objects of the conspiracy, on or about the following dates,

9   defendants MINASSIAN and CINDY, along with Matosyan, F. Manning,

10  Guberman, and others known and unknown to the Grand Jury,

11  committed various overt acts within the Central District of

12  California, and elsewhere, including, the following:

13          a.    On May 18, 2016, using coded language in a

14  telephone conversation, after F. Manning told Matosyan that F.

15  Manning had falsely told the officer conducting the traffic stop

16  that the seized hydrocodone had been legitimately prescribed to

17  F. Manning by R.G., Matosyan assured F. Manning that Matosyan

18  would be able to cover up the drug seizure by obtaining a letter

19  from a doctor purporting that the doctor had legitimately

20  prescribed the seized hydrocodone to F. Manning because, for

21  $200, the doctor would "do whatever the hell we want him to."

22          b.    On June 10, 2016, using coded language in a

23  telephone conversation, Matosyan told defendant CINDY that

24  defendant MINASSIAN, Matosyan, and F. Manning had met and

25  created a plan to cover up the seizure of the hydrocodone pills.

26          c.    On June 10, 2016, using coded language in a

27  telephone conversation, Matosyan informed defendant CINDY that

28  defendant MINASSIAN, Matosyan, and F. Manning agreed that an

34

1 unidentified female "patient" ("UF-3") would falsely claim to

2 law enforcement that the seized hydrocodone had been

3 legitimately prescribed to her, and that UF-3 would falsely

4 claim that she had accidentally left the seized hydrocodone in

5 F. Manning's car.

6          d.    On June 10, 2016, using coded language in a

7 telephone conversation, defendant CINDY and Matosyan discussed

8 the cover-up plan regarding UF-3. Defendant CINDY said that she

9 thought the plan was "good" "as long as each party is willing,

10 at any point, to get up and say 100 percent even if they have to

11 go to court." Matosyan responded that that was not a problem

12 because UF-3 would "do whatever we tell her to do" and that he

13 planned to pay $700 to UF-3, $500 to the doctor, and $200 to the

14 doctor's receptionist for "the paperwork."

15          e.    On June 10, 2016, using coded language in a

16 telephone conversation, Matosyan informed defendant CINDY that,

17 according to defendant MINASSIAN, law enforcement would not

18 attempt to conduct follow-up investigation upon receiving a

19 doctor's letter claiming to have legitimately prescribed the

20 seized hydrocodone to UF-3.

21          f.    On June 21, 2016, F. Manning spoke with a law

22 enforcement officer, during which F. Manning stated that F.

23 Manning's attorney (defendant MINASSIAN) would be providing the

24 law enforcement officer with a doctor's letter regarding the

25 seized hydrocodone.

26          g.    On June 21, 2016, using coded language in a

27 telephone conversation, F. Manning informed Matosyan that a law

28 enforcement officer had just contacted him to obtain a copy of

medical paperwork regarding the seized hydrocodone, and Matosyan agreed to have the fabricated medical records ready by the end of the week.

h.   On June 21, 2016, using coded language in a telephone conversation, Matosyan agreed to meet with defendant MINASSIAN and F. Manning to discuss how to respond to law enforcement regarding the seized hydrocodone, and F. Manning stated that defendant MINASSIAN no longer believed that Matosyan's plan (claiming that the seized hydrocodone had been prescribed to UF-3) would persuade law enforcement.

i.   On June 22, 2016, using coded language in a telephone conversation, Matosyan instructed F. Manning to have defendant CINDY bring a magnetic resonance imaging report to Matosyan, and that Matosyan would use the report to fabricate a medical record to send to law enforcement regarding the seized hydrocodone.

j.   On June 29, 2016, using coded language in a telephone conversation, defendant MINASSIAN instructed Matosyan to falsely state, in a medical letter that Matosyan would fabricate, that the seized hydrocodone had been prescribed to F. Manning by a doctor to treat back pain during a medical examination on May 10, 2016.

k.   On July 1, 2016, defendant MINASSIAN sent a facsimile to law enforcement that included a fabricated medical letter under N.D.'s name, which falsely claimed that N.D. prescribed 150 pills of hydrocodone to F. Manning during a medical examination on May 10, 2016.

l.   On July 6, 2016, using coded language in a
telephone conversation, Guberman informed Matosyan that a law
enforcement officer had contacted N.D. directly, and N.D. had
informed the law enforcement officer that N.D. had never seen F.
Manning as a patient and did not prescribe hydrocodone to F.
Manning.

m.   On July 6, 2016, using coded language in a
telephone conversation, Guberman informed Matosyan that it was
too late to attempt to persuade N.D. to contact the law
enforcement officer to falsely "verify" that N.D. had prescribed
the seized hydrocodone to F. Manning, and suggested that she
(Guberman) would find a different doctor who would falsely
verify prescribing hydrocodone to F. Manning and would provide
fraudulent supporting medical paperwork.

n.   On July 6, 2016, using coded language in a
telephone conversation, Matosyan and Guberman discussed whether
N.D. would accept a bribe of $2,000 to retract his statement to
law enforcement and to falsely confirm that N.D. had prescribed
the seized hydrocodone to F. Manning.

o.   On July 6, 2016, using coded language in a
telephone conversation, Matosyan informed defendant CINDY that
"the problem is fixable" and that Matosyan would visit N.D. the
following morning to persuade N.D. to falsely retract his prior
statement to law enforcement.

p.   On July 6, 2016, using coded language in a series
of telephone conversations, Guberman informed Matosyan that an
unidentified female ("UF-4") worked at a doctor's office, and

1   that UF-4 could help Matosyan in fabricating paperwork regarding

2   the seized hydrocodone in exchange for $3,000.

3            q.   On July 6, 2016, using coded language in a

4   telephone conversation, Matosyan informed defendant MINASSIAN

5   that a law enforcement officer called N.D. and that N.D. denied

6   prescribing the seized hydrocodone to F. Manning, at which time

7   Matosyan chastised defendant MINASSIAN for rejecting his

8   original plan of claiming that the seized hydrocodone had been

9   prescribed to UF-3.

10           r.   On July 6, 2016, using coded language in a

11  telephone conversation, defendant MINASSIAN stated that he

12  (defendant MINASSIAN) assumed that N.D. was "on board" when

13  defendant MINASSIAN agreed to send the fabricated letter under

14  N.D.'s name to law enforcement, to which Matosyan responded that

15  N.D. was "not on board;" defendant MINASSIAN stated that he

16  (defendant MINASSIAN) would attempt to come up with an

17  alternative plan and would contact Matosyan later.

18           s.   On July 6, 2016, using coded language in a

19  telephone conversation, Matosyan and F. Manning discussed how F.

20  Manning and defendant MINASSIAN had rejected Matosyan's original

21  plan to use UF-3 to cover up the seized hydrocodone, how

22  defendant MINASSIAN had devised the alternative plan of falsely

23  claiming that the seized hydrocodone had been prescribed to F.

24  Manning rather than to UF-3, and how F. Manning had

25  miscalculated when he promised that law enforcement would not

26  attempt to verify the fabricated medical documentation, and F.

27  Manning stated that he (F. Manning) would be "locked up" as a

28

1    result of Matosyan's failure to stop the law enforcement
2    investigation.

3              t.   On July 6, 2016, using coded language in a
4    telephone conversation, Matosyan and defendant CINDY discussed
5    whether they could attempt to bribe the law enforcement officers
6    investigating the hydrocodone seizure to stop the investigation
7    from continuing.

8              u.   On July 6, 2016, using coded language in a
9    telephone conversation, defendant MINASSIAN told Matosyan that
10   he (defendant MINASSIAN) had asked F. Manning to provide "a
11   letter from a doctor, any doctor" falsely purporting to verify
12   the prescription, and the two then agreed that Matosyan would
13   attempt to bribe N.D. to falsely claim that N.D. had prescribed
14   the seized hydrocodone to F. Manning.

15             v.   On July 6, 2016, defendant MINASSIAN falsely
16   claimed to a law enforcement officer that he was not aware that
17   N.D. had denied writing the letter that defendant MINASSIAN had
18   sent to law enforcement on July 1, 2016, that defendant
19   MINASSIAN had been told by F. Manning that the seized
20   hydrocodone was legitimately prescribed to F. Manning by N.D.,
21   and that defendant MINASSIAN believed that the letter was
22   genuine when defendant MINASSIAN sent it to law enforcement.

23             w.   On July 6, 2016, using coded language in a
24   telephone conversation, Matosyan informed F. Manning that he
25   (Matosyan) and defendant CINDY would try to convince N.D. to
26   falsely tell law enforcement that N.D. prescribed the seized
27   hydrocodone to F. Manning.

28

x.   On July 6, 2016, using coded language in two telephone conversations and a text message, Matosyan arranged for UF-4 to generate medical records falsely reflecting that an unidentified doctor prescribed the seized hydrocodone to F. Manning.

y.   On July 6, 2016, using coded language in a telephone conversation, Guberman confirmed for Matosyan that UF-4 would be able to generate fraudulent medical paperwork regarding the seized hydrocodone.

z.   On July 6, 2016, using coded language in a telephone conversation, Matosyan told defendant CINDY that he planned to continue trying to convince N.D. to inform law enforcement that N.D. had prescribed the seized hydrocodone to F. Manning, and that he had developed a back-up plan in the event that N.D. did not agree to do so, at which time defendant CINDY offered to join Matosyan in persuading N.D. to lie to law enforcement about the seized hydrocodone.

aa.   On July 7, 2016, using coded language in a telephone conversation, Matosyan assured F. Manning that he (Matosyan) had spoken to N.D. three times earlier that day and that Matosyan was intent on convincing N.D. to lie to law enforcement about the seized hydrocodone.

bb.   On August 26, 2016, defendant MINASSIAN falsely assured a law enforcement officer that F. Manning was being honest in claiming that the seized hydrocodone had been legitimately prescribed to F. Manning by a doctor, and further falsely claimed that N.D. was confused in previously denying that he (N.D.) prescribed the seized hydrocodone to F. Manning.

COUNT THREE

[18 U.S.C. § 3]

[DEFENDANT MINASSIAN]

On or about May 18, 2016, in Los Angeles County, within the Central District of California, Minas Matosyan and Frederick Manning Jr. distributed and possessed with the intent to distribute hydrocodone, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1).

From on or about July 1, 2016, to on or about August 26, 2016, in Los Angeles County, within the Central District of California, defendant FRED MINASSIAN, knowing that Matosyan and F. Manning had committed the offenses described above, assisted Matosyan and F. Manning in order to hinder and prevent Matosyan's and F. Manning's apprehension, trial, and punishment.

COUNT FOUR

[18 U.S.C. § 1001(a)(3); 18 U.S.C. § 2(a)]

[ALL DEFENDANTS]

On or about July 1, 2016, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the United States Department of Justice and the United States Drug Enforcement Administration, defendants FRED MINASSIAN and FIRST NAME UNKNOWN LAST NAME UNKNOWN, also known as "Cindy," along with Minas Matosyan, Frederick Manning Jr., and Sabrina Guberman, each aiding and abetting the other, knowingly and willfully made and used a false writing knowing the writing to contain a materially false, fictitious, and fraudulent statement and entry, in that defendants MINASSIAN and CINDY, along with Matosyan, F. Manning, and Guberman, created and arranged to create a document purporting to be from doctor N.D., which defendant MINASSIAN sent via fax to a law enforcement officer investigating the seizure of hydrocodone pills from F. Manning on May 18, 2016, which letter falsely represented that, on May 10, 2016, N.D. examined F. Manning and prescribed hydrocodone to F. Manning, when, in fact, as defendants MINASSIAN and CINDY, and Matosyan, F. Manning, and Guberman, then knew, N.D. did not see F. Manning as a patient on May 10, 2016, and N.D. did not prescribe hydrocodone to F. Manning on May 10, 2016.

COUNT FIVE

[18 U.S.C. § 1001(a)(2)]

[DEFENDANT MINASSIAN]

On or about July 6, 2016, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the United States Department of Justice and the United States Drug Enforcement Administration, defendant FRED MINASSIAN knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, in that defendant MINASSIAN falsely informed a law enforcement officer that he (defendant MINASSIAN) believed that a letter that defendant MINASSIAN had previously faxed to law enforcement on July 1, 2016 accurately stated that Frederick Manning, Jr. had been treated by N.D. on May 10, 2016, when, in fact, as defendant MINASSIAN then knew, the letter falsely represented that F. Manning had been treated by N.D. on that date.

COUNT SIX

[18 U.S.C. §§ 1519, 2(a)]

[DEFENDANT MINASSIAN]

On or about July 1, 2016, in Los Angeles County, within the Central District of California, defendant FRED MINASSIAN knowingly falsified, made false entries in, and aided and abetted the falsification and false entries in, records and documents, specifically a letter written on defendant MINASSIAN's law firm letterhead and a letter purportedly from doctor N.D., with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Department of Justice and the United States Drug Enforcement Administration, and in relation to any such matter.

FORFEITURE ALLEGATION

[21 U.S.C. § 853]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, in the event of the conviction of defendant FIRST NAME UNKNOWN LAST NAME UNKNOWN, also known as "Cindy" ("CINDY"), under Count One of this First Superseding Indictment.  Defendant CINDY so convicted shall forfeit the following:

        a.  All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which defendant CINDY obtained, directly or indirectly, from such offense;

        b.  All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offense; and

        c.  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs 1(a) and (b) above.

2.    Pursuant to Title 21, United States Code, Section 853(p), defendant CINDY so convicted shall forfeit substitute property, if, by any act or omission of defendant CINDY, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been

1  substantially diminished in value; or has been commingled with

2  other property that cannot be divided without difficulty.

3

4  A TRUE BILL

5

6  /s/

Foreperson

7

8  NICOLA T. HANNA
United States Attorney

9

10  Brandon Fox

11

BRANDON D. FOX
12  Assistant United States Attorney
Chief, Criminal Division

13

CAROL A. CHEN
14  Assistant United States Attorney
Chief, International Narcotics, Money
15    Laundering, and Racketeering Section

16  CHRISTOPHER C. KENDALL
Assistant United States Attorney
17  Deputy Chief, International Narcotics,
Money Laundering, and Racketeering
18    Section

19  BRITTNEY M. HARRIS
JEHAN M. PERNAS
20  Assistant United States Attorneys
International Narcotics, Money Laundering,
21    and Racketeering Section

22

23

24

25

26

27

28