CRAIG MISSAKIAN (SBN 1252020)
LAW OFFICES OF CRAIG MISSAKIAN
790 E. Colorado Boulevard, 9th Floor
Pasadena, CA 91101
Telephone:  (818) 802-9811
Email:  Craig@cmlawpartners.com

Attorneys for Defendant
FRED MINASSIAN

MICHAEL ZWEIBACK (SBN 143549)
DAWN UTSUMI (SBN 247652)
ZWEIBACK, FISET & COLEMAN LLP
523 W. 6th Street, Suite 450
Los Angeles, CA 90014
Telephone:  (213) 266-5170
Facsimile:  (213) 289-4025
Email : Michael.Zweiback@zfclaw.com
Email : Dawn.Utsumi@zfclaw.com

Attorneys for Defendant
FRED MINASSIAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>FRED MINASSIAN<br><br>            Defendant. | Case No.: 2:17-cr-00480-PSG-6<br><br>**DEFENDANT FRED MINASSIAN'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY**<br><br>Hearing Time: 10:00 a.m.<br>Hearing Date: November 19, 2021<br><br>[Time estimate 1 hour] |

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 19, 2021 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6A, 6th Floor, of the United States District Court for the Central District of California, 350 West 1st Street, Los Angeles, CA 90012, Defendant Fred Minassian will and hereby does move for additional discovery from the government pursuant to Rule 16 of the Federal Rules of Criminal Procedure and the government's *Brady* and *Giglio* obligations.  Defendant further moves for a privilege log from the government to the extent it is withholding any documents on the basis of privilege or some other ground.

This motion is made following at least two conferences of counsel in 2020 pursuant to L. R. 7-3, the most recent of which took place on September 9, 2020. Declaration of Craig Missakian ("Missakian Decl."), ¶ 2.   Additionally, in July 2021, counsel for Mr. Minassian sent a letter to Scott Garringer, Chief of the Criminal Division of the U.S. Attorney's Office.  *Id*.  Among other things, the letter reiterated some of the discovery requests that had previously been discussed. *Id*. Mr. Garringer indicated that he would pass the letter along to the chief of the section who would respond if appropriate.  *Id*.   Mr. Minassian's counsel did not receive any further response from the government. *Id*.

This motion is based upon the instant notice, the attached memorandum of points and authorities, the Declaration of Craig Missakian filed herewith, the records in this case, and upon such argument as may be made at the hearing.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY

DATED: October 22, 2021     **LAW OFFICES OF CRAIG MISSAKIAN**

/s/ Craig Missakian
_____
Craig Missakian

Attorney for Defendant
FRED MINASSIAN

DATED: October 22, 2021     **ZWEIBACK, FISET & COLEMAN LLP**

_Michael Zweiback_
_____
Michael Zweiback

Attorney for Defendant
FRED MINASSIAN

2
DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY

# TABLE OF CONTENTS

**I.**   **BACKGROUND**...........................................................................1

    **A.**   The Indictment and Request for Brady/Giglio Materials..............1
    **B.**   Deputy Chief William Crowfoot Probes Mr. Minassian About His
        National Origin......................................................................2
    **C.**   The U.S. Attorney's Office Issues a Press Release Opining on
        Mr.  Minassian's Guilt............................................................3
    **D.**   The Government Refuses to Produce Documents Relevant to
        Mr.  Minassian's Defense.........................................................3

**II.**   **ARGUMENT**...............................................................…...………6

    **A.**   Mr. Minassian Seeks Information That Is Discoverable Under Rule
        16, *Brady* and Its Progeny…………………………………..……6
    **B.**   The U.S. Attorney's Statements In Its Press Release Violated
        Applicable Pretrial Publicity Rules………………………..……8
    **C.**   The Court Should Order The Government To Turn Over *Brady*,
        *Giglio* And Rule 16 Material It Has Refused To Disclose To The
        Defense……………………………………………….…………12

**III.**   **CONCLUSION**……………………………………………...…21

i

# TABLE OF AUTHORITIES

**Cases**

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................8

*Brady v. Maryland*, 373 U.S. 83 (1963) ...........................................................7

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................................7

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006) .................................16

*Kerr v. United States Dist. Ct. for the N. Dist. of Cal.*, 511 F.2d 192 (9th Cir. 1975) .......................................................................................................14

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................................19

*Scott v. United State*s, 436 U.S. 128 (1978) .......................................................17

*United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. CV 16-8697 MWF (SSX), 2018 WL 8459926, (C.D. Cal. Dec. 14, 2018.................................14,16

*United States v. Agurs*, 427 U.S. 97 (1976)........................................................8

*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003) .................................7

*United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996) ...........................................20

*United States v. Corbin*, 620 F. Supp. 2d 400 (E.D.N.Y. 2009) ...........................12

*United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013) ...........................................18

*United States v. Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012)........................13, 19

*United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) .......................................14

*United States v. Liquid Sugars, Inc.,* 158 F.R.D. 466 (E.D. Cal. 1994)...................7

*United States v. Lloyd*, 992 F.2d 348 (D.C. Cir. 1993) .........................................7

*United States v. McGraw-Hill Companies, Inc.*, No. CV 13-779-DOC JCGX, 2014 WL 1647385 (C.D. Cal. Apr. 15, 2014) ................................................14, 17, 21

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997) ......................................16

*United States v. Pedersen*, No. 3:12-CR-00431-HA, 2014 WL 3871197 (D. Or. Aug. 6, 2014)..................................................................................16

*United States v. Perryman*, No. 12-cr-0123, 2013 WL 4039374 (E.D.N.Y. Aug. 7, 2013)...............................................................................................12

*United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013)...........................9, 12

*United States v. Stever*, 603 F.3d 747 (9th Cir. 2010).........................................7

*United States v. Villa*, No. 3:12CR40 JBA, 2014 WL 280400 (D. Conn. Jan. 24, 2014)...............................................................................................13

*United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008)................................7

*United States v. Woodberry,* No. 20-CR-00031 (DLI) 2021 WL 2716508 (E.D.N.Y. July 1, 2021) ..................................................................12

**Statutes**

28 C.F.R. § 50.2.................................................................................9,11

Fed. R. Crim. P. 16(a)(1)(E) ..................................................................7

**Other Authorities**

*Extrajudicial Comments and the Special Responsibilities of Prosecutors: Failings of the Model Rules in Today's Media Age*, 47 Am. Crim. L. Rev. 1513 (2010)...9

United States Department of Justice Manual §9-5 .......................................8, 14, 19

United States Department of Justice Manual §1-7.610................................9, 10, 11

## MEMORANDUM OF POINTS AND AUTHORITIES

By this motion, Defendant Fred Minassian seeks information and documents to which he is entitled under Rule 16, *Brady*, and *Giglio*, but which the government has not produced. Specifically, Mr. Minassian seeks 1) out-of-the ordinary pre-indictment communications about Mr. Minassian, including discussions regarding his national origin; 2) internal notes, memos or other documents relating to the wiretaps; 3) documents reflecting communications between an attorney for the government and the Ventura County Sheriff's Department ("VCSD") detective who posed as Officer "Weilbacher"; 4) under seal filings that reference Mr. Minassian; and 5) internal documents regarding enforcement operations and communications with Legal Counsel for the Executive Office for United States Attorneys relating to Mr. Minassian.

The government has objected to the production of these materials as outside the scope of the government's discovery obligations and/or privileged. To the extent the government is withholding documents on the basis of privilege, Mr. Minassian seeks an order compelling the government to produce a privilege log that briefly describes the documents and their subject matter and fully explains why the privilege attaches to those particular documents.

## I.    BACKGROUND

### A.    The Indictment and Request for Brady/Giglio Materials

Defendant Fred Minassian is a criminal defense attorney who has been practicing law for over twenty-five years and had an unblemished record prior to his indictment. On July 27, 2017, the government procured a 46-page indictment against Mr. Minassian concerning an alleged multi-defendant conspiracy to distribute controlled substances. *See* Dkt. 1. The indictment charged Mr.

Minassian with conspiracy in violation of 18 U.S.C. § 371, false statements in violation of 18 U.S.C. § 1001, and falsifying records in violation of 18 U.S.C. § 1519. *Id*. On January 24, 2020, the government procured a first superseding indictment containing the same charges as the original indictment, plus an additional charge for accessory after the fact to the distribution of and intent to distribute hydrocodone by Minas Matosyan and Frederick Manning in violation of 18 U.S.C. § 3 and § 841(a)(1). *See* Dkt. 505.

The indictment alleges that Minas Matoysan, a former client of Mr. Minassian's, oversaw sham medical clinics "for the purpose of profiting from the sale of thousands of illegitimate prescriptions (the 'fraudulent prescriptions') for controlled substances . . ." *Id*. at 3, ¶ 1. During the investigation into Matoysan, law enforcement received information about one of his co-conspirators, Frederick Manning, and pulled him over while he was driving. *Id*. at 19, ¶ 72. A search of the vehicle uncovered 140 pills of hydrocodone. *Id*. Mr. Minassian later agreed to represent Manning. *Id*. at 20, ¶ 72. The indictment alleges Mr. Minassian was involved in arranging for a fraudulent medical letter to be sent to law enforcement, which falsely represented that the seized hydrocodone had been legitimately prescribed. *Id*. at 22, ¶ 84.

On October 25, 2017, former counsel for Mr. Minassian made a written request for *Brady* and *Giglio* materials. Missakian Decl., Ex. A at 2. In response, the government characterized the request as "generalized, boilerplate discovery requests." *Id*., Ex. B at 2. To date, the government has not produced any documents responsive to this request. Missakian Decl., ¶ 5.

**B.    Deputy Chief William Crowfoot Probes Mr. Minassian About His National Origin.**

While he was being investigated in this action, Mr. Minassian represented defendants in two cases pending in the Central District of California—*U.S. v.*

2

*Bowen*, CR No. 16-00715-GW, and *U.S. v. Avedikian*, CR No. 17-00525. *Id.* ¶ 5. Shortly before he was indicted, Mr. Minassian had a meeting with then-Deputy Chief William Crowfoot in connection with *U.S. v. Bowen*. *Id.* During the meeting Mr. Crowfoot asked Mr. Minassian some highly unusual personal questions about Mr. Minassian's national origin. *Id.* The timing of this meeting—being as it was so close to Mr. Minassian's indictment—raised concerns that the decision to prosecute Mr. Minassian was influenced by his national origin and that he was being singled out for improper and harsher treatment because of it.

**C.    The U.S. Attorney's Office Issues a Press Release Opining on Mr. Minassian's Guilt.**

On May 21, 2020, the United States Attorney's Office for the Central District of California issued a press release (the "Press Release"), ostensibly about co-defendant Minas Matosyan but which also identified Mr. Minassian by name and city of residence. The press release states in relevant part:

> Matosyan also admitted in the plea agreement that he conspired with others, including a lawyer, **Fred Minassian, 53,** of Glendale, to obstruct justice, by providing false medical records to police to thwart an investigation into the seizure of a **load of Vicodin** from one of the conspiracy's **major customers**.

Missakian Decl., Ex. C (emphases added).

**D.    The Government Refuses to Produce Documents Relevant to Mr. Minassian's Defense.**

   1. <u>Counsel for Mr. Minassian Requested Several Categories of Relevant Documents</u>.

***May 21, 2020 Requests***

On May 21, 2020, Mr. Minassian's counsel requested several categories of documents from the government, including:

- Under seal filings in this case that reference Mr. Minassian; and

- Documents concerning "communications between any attorney for the government and Investigator 'Weilbacher'" (the VCSD detective who posed California Highway Patrol Officer Weilbacher) in which the attorney discussed with the VCSD detective whether to speak to Mr. Minassian or what to say or not to say to him.

Missakian Decl., Ex. D (Requests 2, 4).

Despite having made at least fifteen (15) under seal filings "as to" Mr. Minassian,[1] the government has produced only some of those filings to the defense. The government claimed it had disclosed under seal filings "relevant to Mr. Minassian's case, including cooperator plea agreements." *Id.*, Ex. F at 1. However, it objected to producing other under seal filings that reference Mr. Minassian (including sentencing position papers) as outside the scope of the government's discovery obligations, overbroad and vague. *Id.*

As to the "Weilbacher" materials, in an August 26, 2020 response letter, the government represented it had not identified "any documents that contain communications between any attorney for the government and Investigator 'Weilbacher'" in which the government was discussing what to say to Mr. Minassian. *Id.*, Ex. F at 2 (Request 4). Mr. Minassian's counsel explained that because "Weilbacher" contacted Mr. Minassian purportedly in connection with an investigation of Mr. Minassian's client, Frederick Manning, "Weilbacher" knew or should have known that the attorney-client privilege would have made it impossible for Mr. Minassian to say much of anything about his client. Missakian Decl., ¶ 11. On December 9, 2021, Mr. Minassian's counsel clarified that his request was not

---

[1] *See* Dkt. 231, 376, 425, 430, 457, 486, 517, 560, 580, 600, 614 and 646.

limited to *communications between any attorney for the government and Investigator Weilbacher,* but also included **internal documents reflecting such communication**s. *Id.*, Ex. G at 1 (Request 4). Mr. Minassian's counsel then asked whether any lawyer for the government had worked with the Investigator in connection with his speaking with Mr. Minassian. *Id*, Ex. G at 1 (Request 4). If yes, Mr. Minassian requested the identity of the lawyer(s) and whether there are any documents related to the interaction with the investigator. *Id.* The government refused to answer and refused to provide a privilege log. *Id.*, ¶ 12.

***August 4, 2020 Requests***

On August 4, 2020, counsel for Mr. Minassian requested additional categories of documents, including:

- "Wiretap. Any and all law enforcement, prosecutor or others' notes, memos, emails, or communications relating to the application, issuance, and monitoring of the [April 25], 2016 wiretap," including "notes or documents relating to the interception of communications involving the defendant and communications about the defendant";

- "Taint Team. Any and all documents relating to the assignment, assembly, and reports of a 'taint team' in connection with the May 25, 2016 wiretap";

- "Enforcement Operations. Any and all communications including, memos, letters, reports or writings prepared by the U.S. Attorney's Office and submitted to the Policy and Statutory Enforcement Unit of the Office of Enforcement Operations"; and

- "Legal Counsel Communications. All documents including, memos, emails or communication with Legal Counsel for the Executive Office for United States Attorneys regarding the defendant."

*Id.*, Ex. E.

The government produced the wiretap recordings, transcripts, line sheets, and minimization memoranda, but objects to the production of internal law enforcement and prosecutor documents on the basis of privilege. *Id.*, Ex. F at 2 (Request 2).

Despite its general assertion of privilege, the government has refused to produce a privilege log for this request.  *Id*., Ex. F at 2 (Requests 1, 2 and 4).

As to the taint team, on September 3, 2020, the government informed the defense that there was *no taint team* involved in the minimization of calls involving Mr. Minassan.  *Id*., Ex. F at 2 (Request 3).

The government objected to the production of Enforcement Operations and Legal Counsel communications as privileged and outside the scope of the government's discovery obligations.  *Id*. (Request 2, 4).  Mr. Minassian's counsel again requested a privilege log, and the government again refused to provide one. *Id*., Ex. G at 2 (Requests 1, 2, 4).

### September 2, 2020 Request

After learning of Mr. Crowfoot's unusual line of questioning concerning Mr. Minassian's national origin, on September 2, 2020, counsel for Mr. Minassian sought confirmation as to "whether there were any email communications within the office that reflect internal discussions or requests for information—beyond the normal discussion attendant to any indictment—about Mr. Minassian prior to the decision to seek an indictment against him.  *Id*., Ex. H.  Mr. Minassian's counsel also requested a "privilege log" of such material so he could evaluate whether to seek their disclosure.  *Id*.

Counsel for Mr. Minassian and the government discussed Mr. Minassian's request but the government refused to even confirm whether such documents exist.  Missakian Decl., ¶ 15.  The government also refused to provide a "log" of such documents.  *Id*.

## II.   ARGUMENT

### A.   Mr. Minassian Seeks Information That Is Discoverable Under Rule 16, *Brady* and Its Progeny.

1.   <u>Rule 16 obligates the government to produce documents in its possession, custody or control that are material to the defense.</u>

"Federal Rule of Criminal Procedure 16 grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). The pretrial disclosure provided for by the rule is "*mandatory*." *United States v. W.R. Grace*, 526 F.3d 499, 510 (9th Cir. 2008) (en banc) (emphasis in original). Among other things, it requires the government to disclose, at the defendant's request, any documents within its "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).

To obtain discovery through Rule 16, the defendant must make a *prima facie* showing of materiality. *United States v. Bergonzi*, 216 F.R.D. 487, 501 (N.D. Cal. 2003) (citing *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)). The materiality requirement is not a heavy burden; rather, evidence is material as long as there is a strong indication that the evidence will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal. *Bergonzi*, 216 F.R.D. at 501 (citing *United States v. Liquid Sugars, Inc.,* 158 F.R.D. 466, 471 (E.D. Cal. 1994)); *United States v. Lloyd*, 992 F.2d 348, 350-51 (D.C. Cir. 1993). A defendant meets the materiality standard by presenting facts tending to show that the government is in possession of information helpful to the defense. *Bergonzi*, 216 F.R.D. at 501.

2.   <u>Due Process Demands That the USAO Disclose Exculpatory and Impeachment Information.</u>

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to produce any evidence favorable to the defendant or material to his guilt or innocence. *Brady* extends to include impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting

credibility falls within th[e] general rule [of Brady].").  Such disclosures are constitutionally required, even in the absence of a request for them by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

In recognition of these obligations, the United States Department of Justice ("DOJ") Justice Manual ("Justice Manual") explains that the prosecution's obligation extends to seeking *Brady/Giglio* materials from all members of the prosecution team, including federal, state, and local law enforcement officers:

> It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team.  Members of the prosecution team include federal, state, and **local law enforcement officers and other government officials participating in the investigation** and prosecution of the criminal case against the defendant.

Justice Manual § 9-5.001 (emphasis added).

DOJ policy also makes clear that exculpatory or impeachment information must be produced, even if in "internal" documents:

> If such information is contained in a document that the agency deems to be an "internal" document such as an email, an insert, an administrative document, or an EC, it may not be necessary to produce the internal document, but **it will be necessary to produce all of the discoverable information contained in it**.

*Id*. § 9-5.002 (emphasis added).

**B.    The U.S. Attorney's Statements In Its Press Release Violated Applicable Pretrial Publicity Rules.**

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  Therefore, "it is essential that prosecutors respect both the power of their words and their office, and ensure that their public comments are carefully tailored

8

solely to further valid law enforcement interests and to steer far clear of violating a defendant's fundamental right to a fair trial." *United States v. Smith*, 985 F. Supp. 2d 506, 541 (S.D.N.Y. 2013). Prosecutors must take extreme caution when making public statements, as they "have increased likelihood to influence the public because the attorneys speak with the inherent authority of the government." *Id.* (quoting Abigail H. Lipman, *Extrajudicial Comments and the Special Responsibilities of Prosecutors: Failings of the Model Rules in Today's Media Age*, 47 Am. Crim. L. Rev. 1513, 1533 (2010) (citation and internal quotation marks omitted)).

Public statements by prosecutors are governed by certain laws and regulations, including DOJ regulations and the DOJ Justice Manual. The DOJ has regulations that specifically address a prosecutor's duty when addressing the media regarding a criminal proceeding. *See* Release of Information by DOJ personnel relating to criminal and civil proceedings, 28 C.F.R. § 50.2. The DOJ recognizes certain types of information "tend[] to create dangers of prejudice without serving a significant law enforcement function." *Id.* § 50.2(b)(6). Its rules prohibit prosecutors from making any statement "which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial." *Id.* § 50.2(b)(2). Additionally, "[d]isclosures should include only incontrovertible, factual matters . . . . *[W]here background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public*." *Id.* § 50.2(b)(3) (emphasis added).

The DOJ Justice Manual echoes these concerns. It reaffirms the notion that certain statements, including those regarding "the identity, testimony, or credibility of prospective witness" or *"[a]ny opinion as to the defendant's guilt*, or the

possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense," may "prejudice an adjudicative proceeding." Justice Manual, § 1-7.610, Concerns of Prejudice (emphasis added).[2]  As to a defendant like Mr. Minassian who has been indicted but not yet convicted, the department's communications "should be limited to the *information contained in publicly available material, such as an indictment or other public pleadings*." *Id.* § 1-7.700, Guidance for Media Contacts (emphasis added).  "DOJ personnel must avoid making public statements that violate DOJ guidelines, regulations, or legal requirements, including those imposed by case law, applicable bar policies, and local court rules." *Id.*

The release in this case violated the applicable rules and regulations governing pretrial statements to the media in a number of ways.  ***First***, the press release contains the blatantly false statement that Matosyan "admitted in his plea agreement that he conspired with [Mr. Minassian]."   Matoysan's plea agreement does not contain such an admission, and in fact, does not even mention Mr. Minassian by name.  *See* Dkt. 377.  Instead, the relevant portion of his plea agreement states simply that:

> [D]efendant, F. Manning, and other conspirators arranged to send what they knew and intended to be a fraudulent medical record to law enforcement, which falsely stated that the seized hydrocodone had been legitimately prescribed to F. Manning by a doctor with initials N.D.  In fact, as defendant and the other conspirators knew, N.D. did not write the letter that was sent to law enforcement, nor did N.D. ever provide any treatment of F. Manning or give any prescription to F. Manning.

Dkt. 377 at 9.

***Second***, by stating that "Matosyan also admitted in the plea agreement that he conspired with others, including a lawyer, Fred Minassian, 53, of Glendale, to

---

[2] Available at https://www.justice.gov/jm/jm-1-7000-media-relations#1-7.531 (last accessed 10/22/21).

obstruct justice," the press release improperly opines on Mr. Minassian's guilt. Though ostensibly about alleged co-conspirator Matoysan, the carefully worded statement does indirectly what the government cannot do directly by putting words into Matosyan's mouth.  *See* Justice Manual, § 1-7.610(F) ("DOJ personnel should refrain from disclosing . . . '(F) [A]ny opinion as to the defendant's guilt").

**Third,** as the only co-defendant identified by name, the press release suggests Mr. Minassian was front and center of the alleged conspiracy and is more culpable than numerous other co-conspirators—a fact the indictment makes clear is not remotely true.[3]  Further, to remove any doubt about Mr. Minassian's identity, the U.S. Attorneys intentionally published Mr. Minassian's city as "Glendale"— something the release did not even do for Matosyan.  By identifying Glendale (which is known as having a large Armenian population), the U.S. Attorneys not so subtly brought Mr. Minassian's national origin into play.  Because this information "serve[d] no law enforcement function," it "should not [have been] made public." 28 C.F.R. § 50.2(b)(3).

**Fourth**, by referring to "a **load** of Vicodin" and defendant Manning as "one of the conspiracy's **major** customers" while withholding that it was 140 pills— descriptive words *absent in the indictment*—the U.S. Attorneys again imply Mr. Minassian's guilt as a major player in a large drug conspiracy.  Notably, the press release failed to include any statement aimed at protecting Mr. Minassian's

---

[3]In contrast to the press release, the indictment paints defendant Matoysan as the central figure in the large-scale narcotics operation, overseeing several co-conspirators—of which Mr. Minassian is not among those listed—who ran the day-to-day management of sham medical clinics, filled fraudulent prescriptions, and sold pills to black market customers.  *See* Indictment at 3-5.  At most the allegations in the indictment indicate Mr. Minassian played a minimal role in helping to cover up one person's participation in the operation (a fact he vehemently denies) when he faxed to law enforcement a medical note he had received from his client Manning that turned out to be fraudulent.  *Id*. at 5.

presumption of innocence. *Compare United States v. Woodberry,* No. 20-CR-00031 (DLI), 2021 WL 2716508, at *6 (E.D.N.Y. July 1, 2021) (finding DOJ press release did not prejudice defendant, in part because the release included the statement "[t]he charges in the complaint are allegations, the defendant is presumed innocent unless and until proven guilty.").

Taken individually or in their entirety, the statements in the press release could only be interpreted as comments by the government that Mr. Minassian is guilty. *See United States v. Corbin*, 620 F. Supp. 2d 400, 411 (E.D.N.Y. 2009) (finding certain statements by the U.S. Attorney "may violate the disciplinary rules by offering opinions as to [the defendant's] guilt."); *United States v. Perryman*, No. 12-cr-0123, 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013) (granting an injunction to remove statements police had made referring to defendant as "the worst of the bunch"); *Smith*, 985 F. Supp. 2d at 539 (admonishing the government for speaking about "dirty" and "corrupt" politicians in the same press conference where they announced charges against defendant). As such, the DOJ's statements in the press release were improper and the defense is entitled to any and all communications relating to the release and its contents, including drafts and approvals.

### C. The Court Should Order The Government To Turn Over *Brady*, *Giglio* And Rule 16 Material It Has Refused To Disclose To The Defense.

1. <u>The government should be compelled to produce out-of-the ordinary pre-indictment communications about Mr. Minassian.</u>

The U.S. Attorneys' actions in this case suggest Mr. Minassian is being targeted for harsher treatment than other defendants and raise issues of bias and selective prosecution. Needless to say, the former Deputy Chief Crowfoot's intrusive line of questioning about Mr. Minassian's national origin was disquieting.

12

While that incident alone raises concerns, the concerns were elevated when the office issued a press release that included false and misleading statements commenting on Mr. Minassian's guilt.  Those statements were neither relevant nor necessary to the release yet were included anyway in what seems to have been an attempt to poison sentiment against Mr. Minassian or to put pressure on him to plead.

In light of the government's troubling conduct towards Mr. Minassian, on September 2, 2021, Mr. Minassian asked the government whether and to what extent there are "any email communications within the office that reflect internal discussions or requests for information—beyond the normal discussion attendant to any indictment—about Mr. Minassian prior to the decision to seek an indictment against him."  Missakian Decl. Ex. H.  Mr. Minassian simply sought to find out whether such materials exist.  *Id*.  To the extent they do, Mr. Minassian requested a "privilege log" listing such documents.  *Id*.  The government has thus far refused to answer the question, much less provide a log of the documents.

The information requested constitutes potential impeachment material that bears directly on witness credibility.  Any internal communications which reference Mr. Minassian's national origin, the fact he is Armenian, or other out-of-the-ordinary discussions concerning Mr. Minassian are relevant to establishing bias on the part of the government and motive for selective prosecution.  The constitutional requirements of *Brady* and *Giglio* trump any privilege protections on *Brady/Giglio* information.  *See United States v. Gupta,* 848 F. Supp. 2d 491, 496-97 (S.D.N.Y. 2012) (noting the constitutional requirements of *Brady/Giglio* would trump any work product protection); *United States v. Villa*, No. 3:12CR40 JBA, 2014 WL 280400, at *13-*16 (D. Conn. Jan. 24, 2014) (noting *Brady* would trump any work product protection afforded to internal government communications).  If any of the purportedly privilege materials contain information subject to disclosure

under *Brady/Giglio,* the government *must* disclose that information to the defense. *See United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011) (exculpatory information in prosecutor's email should have be disclosed to the defense, even if the email itself was attorney work product).

Notably, "[DOJ] policy regarding the disclosure of exculpatory and impeachment information [] provides for broader disclosures than required by *Brady* and *Giglio."* Justice Manual § 9-5.002.[4] DOJ policy obligates the prosecutor to review "internal documents," and to the extent the prosecutor elects not to disclose an "internal" document, the prosecutor should nevertheless disclose "all of the discoverable information contained in" the internal document. *Id*.

Furthermore, to the extent the government is withholding responsive documents on the basis of attorney-client privilege or any other privilege, the Court should compel the government to produce a privilege log. *See United States v. McGraw-Hill Companies, Inc*., No. CV 13-779-DOC JCGX, 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting "the Government cannot escape its duty to disclose documents by merely brandishing a general claim of privilege," and requiring government to provide "a privilege log that more precisely identifies the documents that are privileged, and more fully explains why the privilege attaches to those particular documents."). It has long been settled in this circuit that the party resisting discovery bears the burden of showing why discovery should not be allowed." *United States ex rel. Poehling v. UnitedHealth Grp., Inc*., No. CV 16-8697 MWF (SSX), 2018 WL 8459926, at *2 (C.D. Cal. Dec. 14, 2018) (citations omitted). Because it is the government who is "currently resisting discovery, the burden of persuasion rests with the Government." *Id*.; *see also Kerr v. United States Dist. Ct. for the N. Dist. of Cal*., 511 F.2d 192, 198 (9th Cir. 1975), aff'd, 426 U.S.

---

[4] Available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002 (last accessed 10/22/21).

394 (1976) ("in camera review is a highly appropriate and useful means of dealing with claims of governmental privilege.").

Accordingly, the Court should order the government to confirm whether there are any communications or other documents that reference Mr. Minassian's national origin or the fact he is Armenian, or reflect other out-of-the ordinary discussions about Mr. Minassian prior to the decision to seek an indictment against him. If there are, the government should be ordered to provide a log of such documents so Mr. Minassian can evaluate whether they should be submitted to the Court *ex parte* and *in camera* for a later ruling on their disclosure.

2.    The government should be compelled to produce internal notes, memos or other documents relating to the wiretaps.

By letter dated August 4, 2020, Mr. Minassian requested "all law enforcement, prosecutor or others' notes, memos, emails, or communications relating to the application, issuance, and monitoring of the [April 25], 2016 wiretap," including "notes or documents relating to the interception of communications involving the defendant and communications about the defendant." Missakian Decl., Ex. E. Although the government has produced some documents (including wire recordings, transcripts, line sheets, and minimization memoranda), it has not produced other highly relevant internal documents. For example, there is nothing concerning authorization to intercept communications with a lawyer, no information regarding why no post-minimization procedures occurred or why a taint team was not used, and no information about who and how the government determined that the attorney-client privilege did not apply to Mr. Minassian's communications with Mr. Matosyan, his former client. The government has objected to the production of internal law enforcement and prosecutor documents on the basis of privilege. The government also has also refused to produce a privilege log for this request.

15

Internal documents concerning the wiretaps and whether conversations with Mr. Minassian as an attorney were approved, intercepted, and minimized, are relevant to evaluating how the wire was handled and whether the government complied with its own minimization procedures.  The information is particularly critical here because the government has said there was no taint team, agent, or United States Attorney involved in determining whether any of the intercepted conversations involving Mr. Minassian, who was recorded discussing information about a ***current client and case***, were privileged.  Missakian Decl., Ex. F.  The government has further represented that the prosecuting AUSAs and agents decided themselves whether something was privileged—a process Mr. Minassian contends is improper.  *See, e.*g., *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006) (finding taint team procedures inadequate, in part because there was no "check . . . against the possibility that the government's team might make some false negative conclusions, finding validly privileged documents to be otherwise. . . ."); *United States v. Pedersen*, No. 3:12-CR-00431-HA, 2014 WL 3871197, at *29 (D. Or. Aug. 6, 2014) ("when the government chooses to review [] material [obtained by the taint team] it is a *per se* intrusion into the attorney-client privilege"); *United States v. Neill*, 952 F. Supp. 834, 840 (D.D.C. 1997) (finding the government "intentionally invaded attorney-client privilege" by having members of taint team review privileged materials during execution of search warrant).  *See also United States ex rel. Poehling v. UnitedHealth Grp., Inc*., No. CV 16-8697 MWF (SSX), 2018 WL 8459926, at *12 (C.D. Cal. Dec. 14, 2018) (finding government's assertion of the privilege was procedurally flawed because "[i]nstead of involving agency personnel in the initial assertion of the privilege, it appears that the Government used contract attorneys to review the documents and determine the applicability of the deliberative process privilege.").

16

Given these facts and circumstances, pursuant to *Brady*, *Giglio*, and Rule 16(a)(1)(E), Mr. Minassian is entitled to know what steps, if any, were taken to minimize the intercepted calls or vet them after the fact before disclosure to the prosecution team and what procedures were used and approvals obtained *before* the interceptions knowing that Mr. Minassian is an attorney.  *See Scott v. United State*s, 436 U.S. 128, 140 (1978) (whether the agents complied with the minimization requirements "will depend on the facts and circumstances of each case.").   And, as discussed above, to the extent the government is withholding documents on the basis of privilege, it should be required to produce a privilege log.  *See McGraw-Hill Companies,* 2014 WL 1647385, at *6.

3.   <u>The government should be compelled to produce documents reflecting communications between an attorney for the government and the state investigator who posed as Officer "Weilbacher."</u>

On May 21, 2020, Mr. Minassian requested "documents that relate to or evidence communications between any attorney for the government and Investigator 'Weilbacher' in which the attorney and/or attorneys are discussing with Mr. 'Weilbacher' whether to speak to Mr. Minassian, what to say or not say to him, or what questions to ask or not ask him."  *Id.*, Ex. D.  Although the government said it had "not identified any documents that contain *communications between* any attorney for the government and Investigator 'Weilbacher,'" that, of course, was a negative pregnant denial in that it refused to say whether there are other documents (i.e., notes, internal memoranda, emails, etc.), relating to such communications or whether communications occurred that are not reflected in documents.   For example, if a lawyer for the government spoke to "Officer Weilbacher," the defense is entitled to know the identity of the lawyer and the content of the communication or communications (either by declaration or by examining the lawyer under oath).

17

The government should be compelled to produce this information. Documents and communications concerning assistance provided to the VCSD detective posing as "Weilbacher" by a government lawyer are patently material to allegations in the indictment and are discoverable under Rule 16, *Brady* and *Giglio*. The questions asked by the VCSD detective about Mr. Minassian's client Manning were designed to put Mr. Minassian into an ethical and practical box: either give evidence to help convict his own client or potentially help convict himself.  Indeed, it appears the call to Mr. Minassian was less about Manning and more about setting up Mr. Minassian with a perjury trap.  Whether a government lawyer directed the state investigator to contact Mr. Minassian and/or provided guidance on what to say and ask, or whether the state investigator contacted Mr. Minassian on his own without first discussing the contact with the AUSAs, is critical to evaluating the propriety or impropriety of such government-directed contacts.  If a government lawyer was directing the state investigator's actions, the state investigator would have been subject to the same ethical strictures as a lawyer.  *See* Dkt. 410-2 (Supervising Attorney's Instruction Regarding Monitoring of Target Telephones, April 25, 2016 ("[Y]ou must be aware anytime an attorney is a party to a conversation at all, and <u>immediately</u> notify the Supervising Case agent. . . If at any time during the investigation, you learn the name of any attorney retained by any possible Target Subject or other involved party, that name and telephone numbers used are to be posted in a conspicuous place so that other Monitors will be aware and so that privileged conversation are not inadvertently intercepted in the future.") (emphasis in original)).  *See also United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013) (vacating conviction because district court erred in denying discovery of information defendant sought in connection with contemplated entrapment defense, even though at trial he ultimately presented different defense).

Moreover, the government should be compelled to produce responsive information in the possession of the VCSD.  Documents in the possession of the VCSD and other third parties' possession, custody, or control are within the custody or control of the government for purposes of Rule 16 and *Brady* because of the VCSD's cooperation with the government.  *See United States v. Gupta,* 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) ("[W]here the investigation is conducted jointly, the Government is charged with reviewing all documents and information connected to that joint investigation and disclosing any exculpatory information."); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (the government's *Brady* obligations impose a duty to disclose not just that material known to an individual prosecutor, but "mean[ ] that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); Justice Manual § 9-5.001 ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team.  Members of the prosecution team include federal, state, and local law enforcement officers … participating in the investigation and prosecution of the criminal case against the defendant.").

### 4.   The government should be compelled to produce under seal filings that reference Mr. Minassian.

Mr. Minassian has reason to believe the government made damning statements about him in an under seal filing to this Court. Missakian Decl., ¶ 16. On May 21, 2020, Mr. Minassian asked the government to "confirm that none of [the under seal filings] include references to Mr. Minassian (or if they do contain references provide us with the relevant portions)."  Missakian Decl., Ex. D.  Although the government said it had produced under seal filings "relevant to Mr. Minassian's case, including cooperator plea agreements," it objected to producing filings that reference Mr. Minassian (including sentencing position

19

papers) as outside the scope of the government's discovery obligations, overbroad and vague. *Id.*, Ex. F.  To the extent any under seal filings contain negative, condemning or unfavorable statements about Mr. Minassian, fairness requires these essentially "*ex parte*" communications with the Court *about this case* be disclosed as a matter of due process so that Mr. Minassian has an opportunity to correct the record if necessary.

5.   <u>The government should be compelled to produce internal documents regarding enforcement operations and communications with Legal Counsel for the Executive Office for United States Attorneys relating to Mr. Minassian.</u>

On August 4, 2020, Mr. Minassian's counsel requested "[a]ny and all communications including, memos, letters, reports or writings prepared by the U.S. Attorney's Office and submitted to the Policy and Statutory Enforcement Unit of the Office of Enforcement Operations," and "documents including, memos, emails or communication with Legal Counsel for the Executive Office for United States Attorneys regarding the defendant."  Missakian Decl., Ex. E.  The government objected to these requests as "outside the scope of the government's discovery obligations and [] privileged."  *Id.*, Ex. F at 2 (Discovery Request Nos. 2 and 4).

As discussed *supra* at Section II.C(1)-(3), internal documents relating to whether conversations with Mr. Minassian as an attorney were approved, intercepted, and minimized, any out-of-the ordinary communications regarding Mr. Minassian (including documents mentioning his national origin), and documents regarding the decision to contact Mr. Minassian about his client Manning, are relevant to establishing bias and motive for selective prosecution.  As such, Mr. Minassian is entitled to this information under Rule 16, *Brady*, and *Giglio*.

Additionally, if the government is withholding responsive documents, it must at a minimum provide a privilege log that describes the documents and their subject

20

matter. *See United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) ("That a person is a lawyer does not *ipso facto*, make all communications with that person privileged."); *McGraw-Hill Companies,* 2014 WL 1647385, at *6 ("[T]he Government cannot escape its duty to disclose documents by merely brandishing a general claim of privilege.").

## III.   CONCLUSION

For the foregoing reasons, the Court should grant Mr. Minassian's motion and compel the government to produce the information and documents described above.   Furthermore, to the extent the government is withholding responsive documents on the basis of privilege, the Court should compel the government to produce a privilege log that describes the documents and their subject matter.

21