Craig Missakian (SBN 1252020)
LAW OFFICE OF CRAIG MISSAKIAN
7990 E. Colorado Blvd., 9th Floor
Pasadena, CA 91101
Telephone: 818-802-9811

Attorney for Defendant
FRED MINASSIAN

Michael Zweiback (SBN 143549)
Dawn Utsumi (SBN 247652)
ZWEIBACK, FISET & ZALDUENDO, LLP
315 W. 9th Street, Suite 1200
Los Angeles, California 90015
Telephone: (213) 266-5170
Facsimilie: (213) 289-4025
Email: michael.zweiback@zfzlaw.com
Email: dawn.ustumi@zfzlaw.com

Attorneys for Defendant
FRED MINASSIAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATED OF AMERICA,<br><br>          Plaintiff,<br>    v.<br><br>FRED MINASSIAN<br><br>          Defendant, | Case No.: 2:17-CR-00480-psg-6<br><br><br>**SENTENCING MEMORANDUM**<br><br><br>Hearing Date: May 24, 2024<br>Time: 10:00 a.m.<br>Dept.: 6A |

## I.    INTRODUCTION

For his entire life, Mr. Minassian worked hard and played by the rules. And for nearly 30 years, he was a hardworking, productive, and respected member of the legal profession without a blemish on his record. He was an immigrant to this country and struggled as a boy to make his way. As a lawyer, he devoted himself to helping other immigrants navigate what is often a confusing, opaque, and frightening criminal justice system. He did so with compassion, patience, and integrity. And, as the many support letters (and offers to speak in Court) show, he is respected not only by colleagues in the defense bar but by judges, police officers, and prosecutors who he worked with over the years. By all accounts, he is and has been a model father, son, lawyer, and citizen.

Then, everything in Mr. Minassian's life changed in an instant. He now comes to Court admitting he made a serious error in judgment. Everyone, of course, makes mistakes. But it is hard to imagine another mistake that has resulted in the loss of so much. Many believe that Mr. Minassian's life up to this point—one marked not only by the tragic drowning of his young son but also by his generosity, charity, and concern for his fellow man—when weighed against the gravity of the error should have merited a second chance. The government, however, felt differently.  And so, having taken responsibility for what he did, having lost virtually everything, Mr. Minassian now looks to the Court to show mercy by accepting the probation department's recommendation and sentence this first-time, non-violent offender, to probation and a fine which is more than sufficient to satisfy the dictates of 18 U.S.C. 3553.

## II.    DISCUSSION

### A.    UNDER 18 U.S.C. § 3553 A SENTENCE OF PROBATION IS MORE THAN NECESSARY TO SATISFY THE PURPOSE OF THE STATUTE

The federal sentencing statute asks the Court to tailor an individualized sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553(a)(2). In determining the particular sentence, the Court considers –

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed –

1

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

A minimally sufficient sentence balances considerations of punishment, protection, and deterrence with the unique characteristics and history of the defendant. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). To arrive at such sentence, a court should begin by correctly calculating the applicable Guideline range recognizing that the Guidelines are the "starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). The court then "must consider the arguments of the parties and the factors set forth in § 3553(a)" to arrive at the least punitive sentence that achieves the goals of sentencing. *Peugh v. United States*, 133 S.Ct. 2072, 2080 (2013). The court may also rely on attributes of the defendant that make him more likely to become "a productive, non-threatening member of free society" when determining the least punitive sentence. *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (upholding probation only sentence for first time offender with a career as a police officer in possession of child pornography). As discussed below, custody in this case would be both unnecessary and inappropriate under the factors outlined above.

## B.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

### 1.    Introduction

It could be called one of the Golden Rules of our—and every other Western—criminal justice system that a punishment should fit the crime.[1] In this case, however, the parties could never

---

[1] First articulated by Cicero in *De Legibus* in 106 BCE, the concept of "let the punishment fit the crime" has been a core principle of criminal justice jurisprudence and philosophy. It is also a concept reflected in the U.S. Constitution's Eighth Amendment. The concept has also evolved into the notion that the punishment should not only fit the crime but also the criminal. *Cf.* 18 U.S.C. § 3553(a)(1).

1  agree on the true gravity of Mr. Minassian's conduct. This disagreement should not, however, be

2  mistaken for Mr. Minassian hesitating to accept responsibility for what he did do. He was willing to

3  do that from the start. But what Mr. Minassian cannot and could not accept is the distorted picture

4  of his conduct that the government painted.

5      The government's view of his conduct—told to this Court, to the grand jury, and to the

6  press—was somewhat exaggerated. It was a picture more calculated to grab headlines during a well-

7  publicized federal effort to crack down on opioids than to convey the complete truth. Although it is

8  hard to fathom how the government could have done so, originally it charged Mr. Minassian with

9  *personally* taking part in the *drug dealing* conspiracy—going so far as to suggest that he profited

10 from the selling of deadly opioids.

11      One reads the grand jury transcripts in vain for any evidence of Mr. Minassian's knowledge

12 of the drug dealing let alone his participation in that crime. In fact, the government was eventually

13 forced to drop him from count 1 of the indictment because—as it knew all along—no evidence

14 whatsoever connected him to that crime. The government should have dropped other charges as

15 well because, logically, he could not have intended to obstruct an investigation into drug dealing,

16 aided and abetted drug dealing, or been an accessory after the fact to drug dealing where he knew

17 nothing about drug dealing—a fact confirmed by a polygraph he took.

18      Did Mr. Minassian make a false statement about the doctor's letter?  Yes. But his actions

19 must  be viewed in context.  He made the statements in what is commonly called a "perjury trap"—

20 where the agent contacted him for no other reason than a hope he might say something untrue. Since

21 the agent already knew the truth about the letter and the drug dealing, anything Mr. Minassian said—

22 true or false—would not have had and in reality did not have, any impact on the investigation. In

23 fact, at the end of *the very same call* where Mr. Minassian feigned surprise about the letter (the false

24 statement), he *offered* to bring his client in to be arrested—in essence waiving the white flag and

25 conceding that the letter was bogus.[2]

26

27      [2] It also bears stressing that the statements themselves—made by a defense lawyer about his
   client—would ordinarily have been taken with a grain of salt or discounted completely by even the
28 most junior investigator. This is not to suggest that the statements he made were not material; he is

Moreover, the statements, as the government has argued, were made at least in part to protect Mr. Minassian himself *minutes* after he learned that the letter his office had faxed to the "detective" was forged. His mind, not surprisingly, was reeling. Can he be faulted for the very human reflex of trying to protect himself? Possibly and in this case he is paying a very heavy price. But what he said also came very close to what is called an "exculpatory no," which DOJ policy says not to prosecute and about which many cases raise concerns about the government manufacturing crimes where no crimes actually occurred.[3] In other words, when Mr. Minassian feigned surprise about the authenticity of the letter, it was as if the agent asked him if he knew the letter was bogus and he said "no."

And Mr. Minassian was not only caught off guard by the agent's well-timed call but he also faced a unique ethical hornet's nest: tell the truth about the client and the letter (the agent asked him in a later call, "[Do] you think your client is being honest with you[?]") and violate California Business & Professions Code § 6068(e)(1) or try to deflect the questions.[4] He mistakenly, and clumsily, did the latter.

The government has argued that Mr. Minassian should have remained silent—and maybe it is right. But hindsight, of course, is 20/20 and it is unsettling to watch as a few words spoken in haste—with no harm to anyone—completely and forever ruin a man's life and wipe away an entire successful career.  Giving advice in a legal brief long after the fact is far easier than making a panicked, complex, real-world decision in the middle of an ethical hurricane. And as any defense lawyer knows, the effect of silence—"Mr. Minassian, the doctor says his signature is forged. [Silence] Mr. Minassaian? [Silence] Mr. Minassian, are you there? I'm sorry detective I can't say anything about the letter"—would have been the same as admitting his client's guilt. So, caught off

---

simply saying that the materiality was a very close call. Mr. Minassian retained a retired FBI agent with over 30 years of experience to testify as an expert on the issue of materiality and he believed that nothing Mr. Minassian said to the agent during the call would have been material under § 1001..

[3] *See* DOJ Justice Manual § 9-42.160.

[4] California Business and Professions Code § 6068(e)(1) provides that a lawyer shall "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Needless to say, and as discussed in detail *infra*, the truth about the letter would have been a "secret" of his client that he could not disclose. Nor could he have answered the question about whether he thought Manning was being truthful with him.

1    guard and between an ethical rock and a hard place, Mr. Minassian tried to tip toe a fine line between

2    not lying to the detective and protecting his client (and himself).  He now stands before the Court

3    fully admitting he missed the mark and for which he will lose almost everything he worked a lifetime

4    to build.

5              2.     Relevant Facts

6

7          This case, as the Court well knows, centers around an opioid trafficking ring operated

     principally by co-defendant Minas Matosyan ("Matosyan"). The government's investigation of the

8    Matosyan ring began in 2014. Mr. Minassian did not appear on the scene until two years later when

9    Matosyan, his long-time client, asked him to represent Freddie Manning ("Manning"). On May 18,

10   2016, a CHP officer—who unbeknownst to anyone was cooperating with the DEA—made a pretext

11   traffic stop on Manning as he drove on the 405 freeway. Because of the wire on Matosyan's phone,

12   the DEA already knew Matosyan, Manning, and others were dealing opioids and that Manning had

13   just picked up a small supply of 140 pills.

14         According to the CHP officer's report, after pulling him over the officer asked Manning if

15   he had "anything illegal in the vehicle such as firearms drugs or US currency[.]"He, of course,

16   already knew the answer to the question. Likewise, when he asked Manning if he could search the

17   car, he knew what he would find. And when Manning told the officer the "pills were his and he

18   possessed a valid prescription for the medication"—the same story he would tell Mr. Minassian—

19   the task force knew it was a lie. And so, when the officer then asked Manning to provide a letter

20   from a doctor saying the pills were his, the DEA was, in reality, asking him to commit a(nother)

21   crime.

22         At some point prior to June 21, 2016, Matosyan contacted Mr. Minassian to ask if he would

23   represent Manning in connection with the stop.  As discussed below, it is unclear why Matosyan

24   felt an attorney was necessary, but Mr. Minassian agreed and waited for Manning's call. At no time

25   then or later did Matosyan tell Mr. Minassian about the drug dealing or the nature of his illegal

26   operations. In fact, Mr. Minassian would not learn about the drug dealing until August *2017* after

27   his arrest when he saw Manning and Matosyan in the holding area of MDC (where both explained

28

1  what was going on and apologized for getting him involved). At the time in 2016, all that Mr.

2  Minassian knew was that Manning was Matosyan's acquaintance and that he needed help.

3       From May 18, 2016 (the date of the stop) until June 21, 2016 when Mr. Minassian first spoke

4  to Manning, Matosyan and Manning themselves spoke several times about their plan to obtain the

5  letter for Manning that the DEA had requested. The first such call occurred the day of the stop on

6  May 18, 2016—long before Mr. Minassian came into the picture. Manning told Matosyan about the

7  stop and the need for the letter, which Matosyan said he could obtain *from a "real good doctor."*

8       (Declaration of Craig H. Missakian ("Missak. Decl."), Ex. A.)

9       After that call, Matosyan and Manning discussed the letter in two calls on June 21. In the

10  first call before Manning spoke with Mr. Minassian that day, Manning asks Matosyan, "so what

11  should I tell Fred?" To which Matosyan responds, "Tell him the way we discussed we'll, we'll send

12  a letter that way." (Missak. Decl., Ex. B.)

13      In the later call on June 21, after Manning spoke to Mr. Minassian, Manning tells Matosyan

14  that "the idea you have right now [the idea of blaming a woman], he [Mr. Minassian] said he's not

15  good with that." In other words, to the extent that Manning told Mr. Minassian about that idea, Mr.

16  Minassian refused to go along with what was clearly a lie.[5] Manning added that "he [Mr. Minassian]

17  said right now he really like [sic] the idea of sending somebody else's." Just as Manning and

18  Matosyan had discussed in the very first call, it appears that Mr. Minassian agreed to involving a

19  new doctor (something Mr. Minassian has always conceded). At no time did Matosyan ever tell Mr.

20  Minassian that the new doctor's signature on the letter would be forged—in fact, that contradicts

21  the original plan as discussed on May 18.

22      These calls suggest that far from bringing Mr. Minassian into the inner circle of the criminal

23  enterprise, the two intended to keep Mr. Minassian in the dark. If not, then why would Manning ask

24  

25  ─────────────
    [5] At this point, it bears noting that it is extremely common for clients to share all sorts of
26  crazy ideas—some legal and some not—with their criminal defense lawyers. The criminal defense
    lawyer usually just ignores the ideas or politely plays along. But under no circumstances is the
27  lawyer's listening or politely nodding his or her head meant to condone, let alone, take part in, what
    the client is suggesting. Nor is listening to a client discuss such ideas—again, legal or not—evidence
28  that the attorney is somehow involved in anything improper. Here, the client discussed an approach
    that was obviously improper and contrary to what Mr. Minassian believed was the truth and he shot
    it down.

Matosyan (the ring leader) what he could tell Mr. Minassian (his own lawyer)? Matosyan makes it clear that what they will tell Mr. Minassian is just what the two had discussed previously. To go from that plan on June 21 to spilling the beans about the entire criminal enterprise on June 22—as the government appears to claim—is inherently unbelievable.[6] In addition, Manning tells Matosyan that Mr. Minassian is "not good with" the "idea you have," meaning the idea to blame a woman. Suggesting, again contrary to the government's claims, that it was Matosyan's, not Mr. Minassian's, idea to blame a woman.

After speaking to him briefly on June 21, Mr. Minassian met with Manning and Matosyan for the first time on June 22, 2016. Prior to that time and up until June 29, 2016, there are no calls between Mr. Minassian and Matosyan. What happened at the meeting is disputed. The government, relying on Manning's version, claims that they told Mr. Minassian about the drug dealing and the plan to submit a forged letter. But, as discussed below, good reason exists to reject everything Manning said during his proffer. That is not only because it contradicts other evidence but because the government *invited* him to deliver Mr. Minassian's head on a platter in exchange for a lighter sentence.

Specifically, as the written summary of the proffer indicates the AUSA's prefatory remarks far from reminding Manning to simply tell the truth offered him a quid pro quo in exchange for a lighter sentence. As the notes indicate, "AUSA Barron informed [Manning] if '*amazing*' information was provided and Manning acts in 'good faith', there was a potential for benefits for [Manning] such as lenient sentencing." (Missak. Decl., Ex. I (emphasis added).) Manning, who is no stranger to the system, would have certainly known exactly what the AUSA meant by "amazing": Deliver information about Mr. Minassian and you will receive a lighter sentence. And that is apparently what he attempted to do by claiming Mr. Minassian was told about the drug dealing and the forged letter.

Since Manning was given a very strong incentive to lie, everything he said should be viewed with extreme caution. In contrast, Mr. Minassian tells a very different story (one corroborated by

---

[6] In fact, during a recent interview of Matosyan, he confirmed that they wanted to use Mr. Minassian and to do that he and Manning had to keep him in the dark.

other evidence and by Matosyan himself, who claims that he and Manning used Mr. Minassian and intentionally kept him in the dark). According to Mr. Minassian, Manning and Matosyan came to his office to discuss the traffic stop and not to discuss different plans to deceive law enforcement. It was a typical new client meeting like the dozens of such meetings Mr. Minassian did each month in his then-always hectic state criminal practice. Those meetings follow a familiar path starting with questions about what occurred, sometimes focusing on a possible defense, with Mr. Minassian taking contemporaneous notes.

The Manning meeting went according to Hoyle. Mr. Minassian's notes reflect nothing more than a routine initial client meeting—and certainly not three members of a criminal syndicate discussing their nefarious plans. (*See* Missak. Decl., Ex. C (attaching notes and signed retainer agreement).) Manning gave details about the stop that would have had no use if Mr. Minassian knew about the drug dealing and the plan to forge a doctor's letter but *were* important if the plan was to dupe Mr. Minassian. According to the notes, Manning said he was "test driving the car," that his passenger "Walker [was] in the car," that he got the car from "dealership McKenna,"[7] that he was "pull[ed] [over] for crossed double line," and that he was followed for "10 miles [to the] Venice Beach exit[.]" Mr. Minassian even noted that he found it "funny" that Manning had a "DL [from] Washington" but an "ID [from] CA." As was his practice, Mr. Minassian added questions for himself to the notes. Here he wrote, "Search the car – Yes  No" to remind himself to assess potential challenges to the search (hardly a question he would care about if he knew what was really going on). The last note on the page, and the most important one, read, "Mine – have prescription."[8]

---

[7] What Manning told Mr. Minassian about the car—that he was test driving it from McKenna Porsche—was a lie. When the CHP pulled him over he told the officer that "he had just bought the vehicle 'yesterday' and pointed to the 'temporary operating permit' taped to . . . the windshield." According to the CHP report Manning was, in fact, the registered owner of the car. Why would a man who (he claims) told Mr. Minassian all about the far-flung drug dealing operation and the plan to counterfeit a doctor's note then bother to lie about something as minor as that to the same lawyer?

[8] For reasons discussed further below, it is important to point out that Mr. Minassian's notes **do not** include the date when Manning was pulled over. Nor does Mr. Minassian recall Manning telling him that date. If Manning had told him, it would have been Mr. Minassian's customary practice to write it down if he thought it was material. But his best recollection is that Manning never told him the date of the traffic stop and, looking back, Mr. Minassian did not consider it a salient fact and so most likely never thought to ask.

These are not the notes of a lawyer who during the meeting had been initiated into a far-flung drug dealing conspiracy and plan to counterfeit a doctor's note; they are the notes of most any criminal defense lawyer hearing a client's story for the first time.[9] And, of course, the most important part of Manning's story for purpose of assessing Mr. Minassian's intent, is the reference to the prescription. Manning told Mr. Minassian he had a prescription for the pills—continuing the very same story he told to the officer—and Mr. Minassian had no reason to doubt him. If Manning and Matosyan intended to show Mr. Minassian all their dirty laundry, why bother telling that lie and the other lies? In reality, Manning *had to* tell those lies and he *had* to make Mr. Minassian believe them.

In a way, Manning and Matosyan found themselves in a version of the so-called Prisoner's Dilemma: If they kept Mr. Minassian in the dark about the drug dealing and forgery of the doctor's signature, he would certainly handle the case. But, if they told him everything, he would certainly have refused—thereby defeating their plan. Recall that up to a point, Manning and Matosyan had handled the situation by themselves—Manning speaking directly to the "detective," promising the letter, and Matosyan working to line up a new actual doctor who, in his words, would do whatever they wanted.[10]

Eventually, and for reasons that remain a mystery,  Matosyan and Manning decided that having a lawyer to represent Manning would help somehow. Maybe they believed it would add a patina of credibility to the letter—an obviously absurd belief—or maybe they just wanted to distance themselves.[11] We do not know why.[12] What we do know is that they wanted a lawyer's help were

---

[9] It is possible that the government will argue that the notes are part of an elaborate plan to cover up the real conversation that occurred—creating an alibi so to speak before one was even needed. With all due respect to Mr. Minassian, very few people are that clever.

[10] The two discussed getting the letter from a new doctor other than doctor "G" (believed to be Dr.) in their very first call hours after the traffic stop on May 18, 2016. In that call Matosyan took down Manning's full name and DOB for use in the letter Matosyan would obtain from an as-of-yet unidentified doctor. In other words, the plan to get a letter from a new doctor was conceived a month before Mr. Minassian came onto the scene and before they walked into his office.

[11] Manning was concerned about the stop and believed that it may not have been random as he told Matosyan during the May 18, 2016 call.

[12] In reality, a lawyer would have added no value to the situation because whether the letter comes from a lawyer or directly from Manning, the detective (if this had not been a set up) would

9

1  certainly smart enough to recognize that if they told Mr. Minassian the whole truth—about the drug

2  dealing and forgery—he would surely say no.[13] In other words, after making the decision to hire a

3  lawyer and driving all that way to meet with him, why immediately risk losing the lawyer by spilling

4  the beans? Logically, and, in reality, it never happened.

5      After hearing Manning's story, Mr. Minassian asked, logically, why he could not simply go

6  back to the doctor who wrote the prescription in the first place. Consistent with the May 18, 2016

7  plan and Matosyan's direction to Manning during the June 21, 2016 call to tell Mr. Minassian only

8  what they discussed, Manning explained that he was "sideways" with that doctor so going back to

9  him was not possible. Someone suggested, Mr. Minassian is unsure who, that Manning could see a

10  new doctor—the same plan that Manning and Matosyan discussed on May 18, 2016 long before Mr.

11  Minassian came into the picture.

12      In hindsight, knowing that Manning and Matosyan were drug dealers, that the pills were part

13  of a narcotics trafficking enterprise, and that Manning had no legitimate prescription for the pills,

14  Mr. Minassian's agreeing to bring in a new doctor might at first glance appear as if he was trying to

15  help cover up that far more serious conduct—and that is certainly how the government has portrayed

16  it. But his intent cannot be judged in hindsight. At the time, the intent although misguided was far

17  different.

18      Recall that Mr. Minassian took Manning at his word and believed he had the pills for

19  personal use (to treat back pain or some other ailment). In fact, the paperwork *the CHP officer* gave

20  Manning and that Manning *gave to Mr. Minassian* indicated exactly that as it listed the violation as

21  California Health & Safety Code § 350, which is a misdemeanor for possession of a controlled

22  substance without a valid prescription.[14] Later, in his first call with the "detective," Mr. Minassian

23  _____

24  have called to confirm the letter with the doctor who signed it. In other words, everything hinged on
   the doctor; the lawyer was simply expensive window dressing that added nothing of value.

25      [13] The parties can quibble about the odds of Mr. Minassian saying no if he knew the truth,
26  but from Mr. Minassian will tell the Court that if he knew they were using him to commit a crime
   he would have 100% refused to get involved. He is not a dirty lawyer but any lawyer, dirty or clean,
27  is smart enough to know that you do not commit a crime—and risk your livelihood and your family's
   financial well-being—for a total stranger and a paltry $4,000 fee. While the saying that everyone
   has their price, it is fair to say that no one has that price to commit that crime for that person.

28      [14] *See* Missak. Decl., Ex. F (attaching property receipt form given to Manning by CHP).

1  indicates this same belief by asking the agent to confirm that Manning, if charged, would be charged

2  with "possession for use."

3      At the very worst, Mr. Minassian could have (although he did not) suspect that Manning was

4  addicted to opioids and had purchased some on the street for his personal use. He never, however,

5  believed, or had reason to believe, that Manning had the pills for sale.[15] As such, the issue in Mr.

6  Minassian's mind was whether Manning had a personal medical need for the pills; not whether he

7  was helping drug dealers cover up their operation—a crime which Mr. Minassian readily admits

8  would have been a far more serious offense. But with his belief in mind, whether a new doctor or

9  the old doctor gave the opinion made no difference—it was Manning's *condition* that mattered. And

10  so long as the doctor examined Manning, which Mr. Minassian fully expected would occur, and

11  also made it clear that he was not the original prescribing physician, it would be up to the detective

12  to accept or reject the opinion after speaking with the doctor.

13      When the two left his office, Mr. Minassian believed Matosyan was going to help Manning

14  find a doctor. Mr. Minassian had known Matosyan long enough to know that he had connections,

15  including with doctors, and believed he would find one to help. The government for its part believes

16  that Mr. Minassian expected that whatever letter he received would be a counterfeit. But there is no

17  evidence (except for Manning's self-serving claims) to support that view. Recall that on May 18,

18  2016 Matosyan promised to get Manning "a real good doctor." Not a real good letter but a real good

19  doctor. So, if Manning and the government are to be believed, then that plan—the good doctor

20  plan—changed on June 22 to the forged letter plan, which simply makes no sense.

21      The Court may recall that AUSA Harris at the hearing on February 3, 2023 represented to

22  the Court that Mr. Minassian in a call with Matosyan said that he (Mr. Minassian) did not care

23  whether the letter was a "good letter" or not—suggesting that Mr. Minassian knew it was going to

24

---

25  [15] In fact, Mr. Minassian had no reason to suspect that there was a federal investigation at all

26  let alone one focused on drug dealing. Manning was pulled over by the CHP "randomly" and the
   task force officer who pressed Manning and then Mr. Minassian for the letter pretended to be a

27  detective from the CHP. In other words, the task force did an excellent job to cover up the
   investigation from the main targets. If no one in the conspiracy knew, then how would Mr.

28  Minassian know or have any reason to believe that Manning's situation was anything other than a
   garden variety possession for use case?

be forged. The representation to the Court, however, was untrue. Here is what AUSA Harris said in the context of trying to convince the Court that Mr. Minassian was a willing participant in what she calls the phony letter:

> And then the third call, same date, 15 minutes later. This call is one where Defendant was recapping to Mr. Matosyan that he had told Manning to get a letter and send it to him, *any letter. It didn't even have to be good. Those are his words*.

(Missak. Decl., Ex. D.) But, in truth, those are not Mr. Minassian words those are Ms. Harris's words. What Mr. Minassian said was different. He said, "So, I, said Fred, can you get me a letter *from a doctor*, any doctor doesn't even need to be good." (Missak. Decl., Ex. E (attaching portion of transcript) (emphasis added).) This is different than the statement made by the government.

Mr. Minassian also believed that whoever the doctor might turn out to be, that the doctor would do an actual examination. Knowing Matosyan as he did and for as long as he had, if Mr. Minassian had stopped to think about it he may have had doubts about whether Matosyan's doctor would be a sterling member of the medical profession, but what he did not doubt is that Manning would see a real live doctor. At no time did Mr. Minassian know or even suspect that Matosyan had decided to counterfeit the letter himself—a fact corroborated by the July 6, 2016 call where Mr. Minassian expresses genuine surprise when Matosyan tells him that the doctor's signature was forged:

> MINASSIAN: Hello?
>
> MATOSYAN: Fred?
>
> MINASSIAN: Yes.
>
> MATOSYAN: You're killing me here dude.
>
> MINASSIAN: Why?
>
> MATOSYAN: Because they called the fucking doctor.
>
> MINASSIAN: Okay?

In other words, Mr. Minassian genuinely believed that law enforcement would contact the doctor to verify the letter. If he had known that the doctor's signature was going to be forged, he would not have reacted as he did with, in essence, "so, why is that a problem?"

1    But even more important, there is no evidence that Matosyan changed his mind—from the

2    "real good doctor" plan on May 18 to the forged signature plan until sometime *after* the June 22

3    meeting with Mr. Minassian. The forged letter was not part of Matosyan's initial plan, as the May

4    18, 2016 call shows. There is, as the government will point out, a call where Matosyan *claims* he

5    told Mr. Minassian that the doctor was not "in on it"—meaning Mr. Minassian knew that the letter

6    would be forged—but the statement makes no sense. There is no intercepted call where Matosyan

7    tells that to Mr. Minassian. And Matosyan's only meeting with Mr. Minassian was June 22. And

8    just the day before that meeting Matosyan and Manning agreed to tell Mr. Minassian only the "real

9    good doctor" plan. And, again, faced with the "Prisoner's Dilemma," telling Mr. Minassian that *he*

10   was about to commit a serious crime (for just $4,000 no less) would be an invitation to have Mr.

11   Minassian toss them both out of his office. In short, Matosyan's statement does not ring true.

12        The government will also surely point out that Mr. Minassian and Matosyan had a

13   conversation about what the letter should say, which Mr. Minassian does not dispute, suggesting

14   that is evidence of Mr. Minassian was somehow the mastermind behind the bogus letter. The logic

15   behind the government's conclusion, however, is flawed. To draw the government's inference, one

16   must accept the premise that telling Matosyan what the letter should say and referring to the date of

17   May 10 proves that Mr. Minassian knew: (1) that Matosyan was going to forge a doctor's signature,

18   (2) that no real doctor would be involved; and (3) the letter would be backdated. None of these

19   conclusions, however, must follow—and none are true.

20        In state court criminal practice lawyers provide doctor's and other letters to law enforcement

21   (to the DA's offices, the city attorney's offices, or police departments) frequently.[16] In those

22   situations, the lawyers invariably tell the clients what the letter should say. On very rare occasion,

23   the conversation occurs between the lawyer and the doctor directly—it is rare because doctors are

24   often too busy to be bothered speaking with a lawyer. So, in 99% of the cases, the conversation

25   takes place with the client. It is neither improper nor unusual. And since Mr. Minassian believed

26

27   ───────────────

     [16] Mr. Minassian's practice was no different. And each time he provided such a note or other
28   he fully expected that the recipient—be it a DDA or a police officer—would fully vet and verify the
     material, as he expected would occur here.)

1  Matosyan was helping Manning find the doctor, speaking to Matosyan as a proxy made perfect

2  sense.[17] Nor is the call evidence of deliberate back dating. Manning never told Mr. Minassian the

3  date of the stop and so when Matosyan said "May 10" the date meant nothing to him—it was as if

4  Matosyan had said, "…and on such and such date…"

5           The government has also suggested—based on Manning's proffer it seems—that at

6  some point *Mr. Minassian* suggested that instead of getting a doctor's note for Manning that they

7  say the pills belonged to a woman who left them in the car—again, admittedly more serious conduct.

8  While discussion of that plan did occur between *Matosyan and Manning*, to suggest that Mr.

9  Minassian came up with the idea himself is absurd. That is because the suggestion first surfaced in

10 a call between Manning and Matosyan, long before Mr. Minassian came into the picture.[18] In fact,

11 the government itself came to that same conclusion. During the grand jury, AUSA Ben Barron and

12 the agent made that clear:

13                **[AUSA]**

14     Q.    And what happened during the initial call between that officer and
              Minassian?

15     **[Agent]**

16     A.    So the law enforcement officers reached out to Fred Minassian, and they
              described what happened on – they were describing the situation and told

17            Fred Minassian that they needed a letter from Freddie's doctor saying that he
              was legitimately prescribed the pills that were found during the traffic stop.

18

19     **[AUSA]**

       Q.    And, in fact, the initial plan ***Matosyan suggested*** was to make it look like
20            another woman had the prescriptions prescribed to her.

21     In truth, the only action Mr. Minassian took regarding the "other woman" plan, which for a

       variety of obvious reasons was absurd on its face, was to shoot it down.

22

23           Finally, the government has alleged that Mr. Minassian agreed—after hearing from

24 both Matosyan that the letter was forged and speaking with the agent—with Matosyan's plan to

       bribe the doctor. The exchange came during the second call on July 6, 2016:

25

26           MINASSIAN: [U/I] – my, my understanding is, I don't know who they

27           _____
             [17] Nor did it or should it have set off alarm bells in Mr. Minassian's head. He still believed
             Manning would see a real doctor, albeit one arranged for him with Matosyan's help.

28           [18] [INSERT QUOTE FROM CALL]

                                    14

called, [U/I] – I don't know what they're doing. The guy said just said me a letter, which was much easier. I convinced him a letter will do. He didn't want a prescription, he didn't want any of the song and dance. So I, I said Fred, can you get me a letter from a doctor, any doctor doesn't even need to be good. He goes yes, no problem. *** I don't know what's happening in the backdrop, whether, whether the doctor is onboard or not. I'm assuming the letters that are coming to me, they're kosher.

> MATOSYAN: So what's the alternative?

> MINASSIAN: You know, I don't know the guy…."

> MATOSYAN: Okay, alright I'll, I'll try to see if we can bribe this doctor but I don't know.

> MINASSIAN: Okay, alright.

But merely saying "Okay, alright" in response to the obviously absurd suggestion is not, and cannot be, enough to demonstrate Mr. Minassian's intent to join a conspiracy to bribe a witness. In fact, Mr. Minassian far from trying to put off the "detective" long enough to bribe the doctor, had already offered to bring Manning in to be arrested. In other words, his *actions* suggested he was only robotically mouthing words meant to get off the phone, which anyone who knows him will state under oath he does at the end of virtually every phone call.

> 3.    Government's version of Mr. Minassian's conduct

Mr. Minassian is willing to admit what he did. But is the government willing to admit it unfairly destroyed this man's reputation? In any case, it is important for the Court to appreciate what occurred as it goes to the punishment Mr. Minassian has already suffered and underscores why jail on top of that would be unjust and unfair. *See United States v. Anderson*, 533 F.3d 623, 633-34 (8th Cir. 2008) (concluding a sentence was not unreasonable where the district court considered, *inter alia*, punishment from loss of reputation and adverse effect on the defendant's marriage).

As noted above, the investigation here began in 2014 and appears to have been extensive, involving at least 9 different law enforcement agencies, including DEA, IRS, and ICE. It included the wiretaps on Matosyan's phone of which the Court is aware and much more. It included cooperating informants at clinics and pharmacies, surveillance at Matosyan's apartment, three suspected bogus clinics in Van Nuys, Anaheim, and Orange, and pharmacies. It also included undercover operations and under cover video taken at one or more of the clinics. There were toll records showing over 9,000 calls and 1000 text messages involving several hundred phone numbers.

1 The IRS also did a financial analysis, digging into bank records and tax returns.

2      And yet at no time during this far-flung, years-long drug trafficking investigation—with the

3 means and opportunity to leave no stone unturned—did the government once come across Mr.

4 Minassian. He was not picked up on any call or text, not mentioned in any document, not seen during

5 in any surveillance or video, and not identified by any witness. In short, there was no evidence

6 whatsoever that prior to the Manning CHP stop that Mr. Minassian knew anything about the

7 conspiracy. In other words, the government had zero evidence tying Mr. Minassian to the drug

8 dealing conspiracy.

9      The government, however, was not deterred by the lack of evidence and on July 27, 2017

10 indicted Mr. Minassian along with 12 others for conspiracy to commit drug trafficking. As noted

11 above, the government years later dismissed Mr. Minassian from that count, but that was not a bell

12 that could easily be un-rung.[19] Nor did the government put out a press release admitting to its

13 mistake. Then, as if the indictment alone was not enough, the government—in violation of its own

14 rules governing pre-trial publicity—put out a press release on August 3, 2017.

15      The headline of the press release was sensational, "Operators of Bogus Medical Clinics

16 Charged in Conspiracy to Divert Massive Amounts of Prescription Narcotics to the Black Market."

17 The sub headline did not call out *Matosyan* the known ring leader; rather, it called out *Mr. Minassian*

18 making it appear that he was the leader: "Glendale Defense Attorney *and Others* Involved in Scheme

19 Allegedly Obstructed Justice by Creating Fake Medical Records to Justify Fraudulent

20 Prescriptions." To call out Mr. Minassian—while relegating Matosyan to the group of unnamed

21 "Others"—was bad enough but even worse what it said about Mr. Minassian was a complete

22 fabrication. Mr. Minassian had no knowledge of—let alone involvement in—any "fraudulent

23 prescriptions."

24

25

26      [19] Just recently, a person at a social function was heard to say after news of Mr. Minassian's guilty plea broke, "Now we know how he maintained his lifestyle, he was dealing drugs." The fact

27 that the charge to which Mr. Minassian pleaded guilty says nothing about drug dealing is, of course, irrelevant as such fine distinction are often lost on anyone but the most astute observer. To everyone

28 else, Mr. Minassian had been charged with drug dealing and then pleaded guilty. Case closed.

The press release included repeated references to what the "conspirators" had done without distinguishing between Mr. Minassian and the others. For example, it said that "[t]he *conspirators* . . . stole the identities of doctors who refused to participate in the scheme." Or that "the conspirators issued prescriptions and submitted fraudulent billings in the name of a doctor who at the time was hospitalized and later died." Or "'[t]he defendants in this scheme [singular] heartlessly lined their pockets with cash from the sale of thousands of addictive prescription drugs sold through the black market ... [and] [f]or the sake of mere profit, the operators of these medical clinics spewed deadly drugs into our streets.'" Or, "Today's arrests underscore our resolve—DEA and its law enforcement partners will not tolerate criminal enterprises that fuel and exploit the opioid epidemic." The message was clear: Mr. Minassian was part of—and in fact led—the "criminal enterprise" and had blood on his hands even though he had no idea what was occurring and did not see a dime of the "cash" with which others were "lining their pockets."

It would take more than two years for the government to correct the gross injustice when it finally dismissed him from Count 1. But, of course, the damage had already been done. And did it do the right thing and issue a new press release explaining that the first one was wrong? No. Rather, it did even more damage. On May 21, 2020, the government put out another press release heralding a lengthy sentence for Matosyan. The headline, "Encino Man Sentenced to 9 Years in Prison for Leading Conspiracy to Distribute Opioids via Sham Clinics and Corrupt Doctors," made it very clear that the conduct involved a conspiracy to distribute opioids. Ironically, Matosyan had become the "leader" of the conspiracy.

The release went on to say, "Matosyan was arrested in August 2017 pursuant to a federal grand jury indictment charging him ***and 12 other defendants*** [which would include Mr. Minassian] with scheming to divert at least 2 million controlled prescription pills for sale on the black market." Then, the release stated that "Matosyan also admitted in the plea agreement that he conspired with others, including a lawyer, Fred Minassian, 53, of Glendale, to obstruct justice, by providing falsifying [sic] medical records to police to thwart an investigation into the seizure of a load of Vicodin from one of the conspiracy's major customers."

Putting aside the obvious problems with this press release. For example, the false impression

1   that Mr. Minassian was involved in the drug dealing conspiracy even though Mr. Minassian had

2   been dismissed from that charge. Or the mischaracterization of what was seized as a "load"—a word

3   that conjures up large containers transported on commercial vehicles vs. two small pill bottles in a

4   Porsche 911. The most troubling aspect of this release is that it states that Matosyan admitted he

5   agreed with Mr. Minassian to obstruct justice—meaning obstruct justice into the investigation of

6   the broader drug trafficking conspiracy. As noted above, Mr. Minassian had no idea about the drug

7   dealing let alone that Manning was one of the "conspiracy's major customers." But even more

8   important Matosyan *never admitted* to anything about Mr. Minassian in his plea agreement which

9   does not even mention him by name. The statement was completely false.[20]

10      Why the government misled the public (and the grand jury) about Mr. Minassian's role in

11  the offense is inexplicable. But one thing is certain, whether intentional or reckless, the

12  misstatements it made about Mr. Minassian stuck in the public's mind. He was tarred as a drug

13  dealer—as having profited from the deaths of innocent victims of the opioid crisis—and there is

14  nothing he or anyone else can do to change that perception. The government wields enormous

15  power, and we should expect that it be wielded responsibly. Mr. Minassian has already paid a steep

16  price for what he did do. And he hopes the Court will recognize that because of the government's

17  statements about him, he is likely to suffer well beyond when his debt to society has been paid.

18      **C.    HISTORY AND CHARACTERISTICS OF THE DEFENDANTS**

19      The probation report and the many support letters from family, friends, and colleagues (*see*

20  Missak. Decl., Ex. G (attaching letters)) and the fact that so many have not only agreed to speak but

21  *asked* to speak on his behalf, is a testament to a man who has led a good and decent life. He is a man

22  who has earned the respect—through both words and deeds—of the people that know him best.

23  While his has been a life marked with unspeakable tragedy when his young son drowned and the

24  hardship of adjusting to a new life here in the United States, he has not let circumstances stop him.

25  Rather, he has always worked hard, defied the odds, and has led a law-abiding productive life

26  _____

27      [20] The government has declined to give Mr. Minassian a copy of the Matosyan plea
    agreement and so the defense has no other option than to respectfully ask the Court to review it. But,
28  the defense has spoken to Matosyan's defense counsel and he confirms that the press release does
    not say what the government claims.

1  devoted family, friends, and helping others.

2          This is the first time he has made a mistake like this and, as he will tell you and as Dr. Karim

3  concludes in his report,[21] it will certainly be the last.[22]  As a lawyer, Mr. Minassian practiced for

4  nearly 30 years. He had an unblemished record—not even a sanction to speak of—and he helped a

5  lot of people. And he did it while earning the respect of not only his fellow defense lawyers but just

6  as important the prosecutors and police officers with whom he worked on a regular basis. Had these

7  individuals known him a shorter period or by reputation alone, one could be tempted to discount

8  their opinions. But they have known him for years and worked with him through countless cases.

9  Through all of that, it was his character—for trustworthiness, honesty, and integrity—that they saw

10 and respected and emphasizes the fact that what he did here was a true aberration.

11         Ironically, the government itself at one time relied on Mr. Minassian's integrity as well.

12 During the pendency of these criminal charges, a former client of Mr. Minassian's petitioned Judge

13 Wilson to allow her to withdraw her guilty plea claiming that Mr. Minassian had failed to advise

14 her properly or completely about the consequences of the plea. The government opposed the request

15 and asked Mr. Minassian to help rebut the defendant's claims. Whereas most individuals in his

16 situation would have felt little obligation to assist the government when it asked, to his credit Mr.

17 Minassian agreed without hesitation. The government thereafter used Mr. Minassian's testimony to

18 rebut the claims and Judge Wilson made a specific finding that he was credible and denied the

19

20         [21] In what can only described as extraordinary, Dr. Karim all but stakes his reputation on the
fact that there is no risk that Mr. Minassian will cross the line again. As Dr. Karim puts it:

21

22             At present, I would opine that Mr. Minassian understands the need to
        continue to seek out mental health treatment in order to help him heal his past
23      traumas, as well as understand the extent to which they may impact his daily life. He
        has taken this seriously based on his initiation of mental health services with a
24      licensed therapist. And certainly, it would be safe to conclude (with one hundred
        percent certainty) that he poses no danger to the community, nor any risk to recidivate
25      in any capacity. He has continued to develop insight into his past (isolated) behavior,
        and he continues to be doing his best to move forward with his life and put the past
        behind him.
26
        (Missak. Decl., Ex. H (attaching psychological report of Dr. Nadim Karim and letter from
27 his current therapist who is helping him get back on track). Dr. Karim has also offered to appear in
    Court to address any specific questions the Court may have.
28
        [22] See Missak. Decl., Ex. J (attaching Mr. Minassian's personal letter).

1    defendant's request.

2    **D.    THE NEED FOR THE SENTENCE IMPOSED**

3        1.    <u>Seriousness of the offense, just punishment, respect for the law</u>

4        Mr. Minassian's conduct was serious. No one, least of all Mr. Minassian, denies that. But as

5    the cases (and DOJ policy itself) recognize not all 1001 violations are created equal.   If the

6    seriousness of a crime can be judged by its effect on the victim—in this case government function—

7    then the seriousness of the offense should fall at the lowest end of the spectrum. Mr. Minassian had

8    no idea about the narcotics trafficking let alone the federal investigation. As such, he could not have

9    intended to interfere in an investigation he knew nothing about. To the extent he did intend to

10    interfere in an investigation—although he never looked at it in that way—at worst it was an intent

11    to help his client with a misdemeanor possession for personal use *where he believed the client*

12    *already had a valid prescription*. That is a far cry from knowingly helping Manning and Matosyan

13    cover up a large-scale drug trafficking operation.

14        Mr. Minassian's real crime is less about what he said to the agent and more about his role as

15    a lawyer. When confronted with Manning's story about having lost the prescription, maybe he

16    should have been more skeptical. But advancing a client's defense—even a client who you may you

17    suspect is telling a lie—is not a crime. Mr. Minassian's true offense was allowing himself to be

18    sucked into the *Matosyan* scheme in the first place. Where he should have declined, he instead

19    thought to himself, "What's the harm?" While that is a serious mistake, having now lost his law

20    license is a more than a fitting punishment. *See United States v. Whitmore*, 35 Fed. App'x 307, 322

21    (9th Cir. 2002) (unpublished) (the destruction of one's "'professional capacity' and 'ordinary

22    livelihood' constitute[s] a 'pretty serious punishment already inflicted and carried out . . . and one

23    that's likely to be permanent'").

24        2.    <u>To afford adequate deterrence to criminal conduct and to protect the public</u>

25

26        These are not grounds that warrant imposition of a custodial sentence either. Mr. Minassian

27    has no criminal record and it is highly unlikely that he would ever commit another offense. In other

28    words, having had his world turned upside down once, he is unlikely to ever do anything to have it

happen again. He is also in his mid-50s at an age where recidivism rates for non-violent offenders are already very low. See Kim Steven & Billy Easley, U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders. Moreover, as explained in his report, Dr. Karim all but stakes his professional reputation on the fact that Mr. Minassian will never cross the line again.

Nor do concerns about general deterrence warrant a custodial sentence. Mr. Minassian's disbarment and the other severe consequences of the conviction have already sent a strong message to the public—and the defense bar where his case is often discussed—about the dangers of lying to law enforcement. It has truly become a cautionary tale. And general deterrence alone is not a factor that can make imprisonment "necessary" under § 3553(a) where the other factors strongly militate against custody. *Cf. United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) ("Section 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration.").

### E.    THE GUIDELINE RANGE

Mr. Minassian does not object to the Guideline's range as calculated in the PSR. As is set forth in the PSR, a sentence of probation is still appropriate and, in fact, encouraged under the Guidelines. *See* U.S.S.G. § 2C1.1 Application Note 10; PSR ¶¶ 115 and 116. *See also* 28 U.S.C. § 994(j) ("[t]he Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment** in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense"). Although these provisions do not mandate a non-custodial sentence, they strongly suggest that a custodial sentence would be "greater than necessary" to satisfy the other § 3553(a) factors in this case.

### F.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

This, of course, is not the first case involving a lawyer that the U.S. Attorney's Office for the Central District or other districts have prosecuted. Yet, the other cases involved far less severe resolutions where the conduct was significantly worse. Two older cases and one more recent case

before Judge Blumenfeld stand out. The first, and possibly most closely analogous, is *United States v. Margarita Mkrtchyan*, CR No. 09-176-AG and the second is *United States v. Pierce O'Donnell*, CR No. 08-872-SJO.

In *Mkrtchyan*, the office charged defendant, an immigration lawyer, with not only participating in but orchestrating a large-scale immigration fraud scheme where she made thousands of dollars from the fraud. The scheme involved filing with the court fraudulent documents that she herself had procured. As the State Bar described the conduct,

> "[r]espondent orchestrated with a diplomat in the Armenian Consulate to obtain Letters of Refusal for clients in immigration matters, regardless of their actual citizenship. Respondent engaged in these dishonest acts, so as to ensure that her clients, who were facing deportation from the United States to Armenia, would be released by ICE from deportation proceedings and permitted to stay in the United States."[23]

After charging her with multiple felonies, the office allowed Mkrtchyan to plead guilty to one count of violating 18 U.S.C. § 1509 *as a misdemeanor*. She was sentenced to eight months home confinement and two years probation and was suspended by the State Bar for 18-month suspension.

In *O'Donnell*, the office charged Mr. O'Donnell with multiple felony violations including conspiracy to commit campaign finance violations and false statements under 18 U.S.C. § 1001. The gist of the conspiracy was that Mr. O'Donnell—a well-known Los Angeles attorney—orchestrated a conspiracy to make conduit campaign contributions in the 2004 presidential election. The indictment charged over a dozen such contributions. As serious as this conduct was, the government allowed Mr. O'Donnell to plead guilty to two Class A misdemeanors (2 U.S.C. § 437g(d) and 18 U.S.C. § 2(b)). He was sentenced to pay a fine, 60 days in custody, 120 days in a residential facility, supervised release for one year, and 200 hours of community service. He received a 6-month suspension from the State Bar.

More recently, the office charged not a lawyer but a congressman in *United States v. Fortenberry*, No. 21-cr-491-SB. Much like the present case, Congressman Fortenberry was the victim of a perjury trap stemming from an investigation into illegal campaign contributions to his

---

[23] *United States v. Margarita Mkrtchyan*, CR No. 09-176-AG

campaign at a 2016 fundraiser. Mr. Fortenberry did not know about the illegal contributions at the time. Rather, a co-host of the fundraiser, who was cooperating with the FBI and acting as an informant, called him well after the fact and told him about the illegal contributions—much as Matosyan called Mr. Minassian here and told him the letter was forged. Later, when the FBI interviewed Mr. Fortenberry and asked him if he knew the contributions were improper, he denied being aware of the illegal contributions (even though at the FBI's direction he had been told). The case went to trial and he was found guilty of violating 18 U.S.C. § 1001(a)(1) and two counts of violating subsection (a)(2). Judge Blumenfeld sentenced him to probation and a fine of $25,000.[24]

In addition to the above Central District cases, in a case from the District of Columbia in *United States v. Clinesmith*, CR No. 20-165 the government allowed Mr. Clinesmith—a former top FBI HQ attorney—to plead guilty to a single count of violating 18 U.S.C. § 1001. Mr. Clinesmith had doctored an email that was relevant to the FISA surveillance application filed against Trump aide Carter Page. Although the original FISA application and three renewal applications were shot full of misstatements, Mr. Clinesmith's misrepresentation would have been crucial to the FISC's probable cause determination.

If any of the four separate FISA court judges had known the truth about Mr. Clinesmith concealed, the application would have most likely stopped in its tracks—and Mr. Page's rights not violated. In other words, there was substantial damage done to the integrity of the FISA process by Mr. Clinesmith's deception. Yet, on those facts—facts which are far more egregious than involved here—he was sentenced to 12 months probation and 400 hours of community service. Moreover, the District of Columbia Bar's disciplinary office agreed to recommend a 1-year suspension noting that his case "involves only a single incident, not a pattern of misconduct" and was consistent with discipline of other attorneys who received one-year suspensions for sending a falsified document to a U.S. agency.

Mr. Minassian's conduct pales by comparison to Ms. Mkrtchyan fraud scheme, the fraudulent campaign contribution scheme Mr. O'Donnell organized, and the fraud on the FISC that

---

[24] Mr. Fortenberry's conviction was eventually reversed by the Ninth Circuit in *United States v. Fortenberry*, No. 22-50144 (9th Cir. Dec 26, 2023) for improper venue.

Mr. Clinesmith committed. Unlike Mkrtchyan, Mr. Minassian did not seek to profit from his actions. Rather, as Dr. Karim explained, "his need to 'people please,' combined with his untreated mental health needs, as well as his emotional stressors at the time, contributed to the behavior[.]"

And the harm done by Mkrtchyan's, O'Donnell's, and Clinesmith's conduct was tangible—unlike what occurred here where there was no harm to anyone at all, much like the Fortenberry case. In Mkrtchan's case, her fraud resulted in individuals who should have been deported remaining in the United States, possibly to commit additional crimes, and thousands of dollars in her pocket. O'Donnell sought influence a presidential election. And Clinesmith did no less than undermine one of the country's most important national security bodies—not to mention what he did to the rights of a U.S. citizen.

By contrast, Mr. Minassian's conduct resulted in no harm to the government or its investigation whatsoever. While we understand the government believes Mr. Minassian is the one who dreamt up the letter idea in the first place, the intercepted calls do not support that view. Nor was the call to Mr. Minassian by the agent necessary since the investigator had everything he needed to charge Manning before the call. In short, unlike the other three cases discussed above that were resolved with misdemeanors and, in Mr. Clinesmith's case, a simple § 1001, Mr. Minassian's conduct resulted in no harm or prejudice to anyone. Yet, he has already been punished—with a disbarment as opposed to suspension—far beyond the others. In short, using these past cases as a guide, a prison commitment would not avoid but create an unwarranted sentencing disparity, as 18 U.S.C. § 3552(a)(2)(6) requires.

## III.    CONCLUSION

The road ahead for Mr. Minassian is long and bleak. Although many friends and colleagues now shun him and whisper behind his and his children's backs, the people that know him best—that know his true character—have stood by him. And for that he is fortunate. He is getting the help he needs from a mental health professional. And he is doing his best to rebuild, as best he can, a life. And so, he simply asks that in fashioning a sentence that the Court recognize the steep price he has already paid and recognize that a custodial sentence on top of what he has already suffered will

serve no useful purpose under § 3553. As such, he respectfully requests that the Court follow the USPO's recommendation and sentence him to one year of probation and a fine.

Dated:  May 14, 2024                          **LAW OFFICE OF CRAIG MISSAKIAN**


By:  _____
                                   Crais Missakian
                                   Attorney for Fred Minassian


Dated:  May 14, 2024                          **ZWEIBACK, FISET & ZALDUENDO, LLP**


By:  _____
                                   Michael Zweiback
                                   Attorney for Fred Minassian

**PROOF OF SERVICE**

I, Leslie Becerra, declare:

1. I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action.

2. My business address is ZWEIBACK, FISET & ZALDUENDO LLP, 315 W. 9th Street, Suite 1200, Los Angeles, CA 90015.

3. On May 14, 2024, I served the document(s) described as **SENTENCING MEMORANDUM** on the interested parties in this action as follows:

See Attached Service List.

☐ BY MAIL: I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 315 W. 9th Street, Suite 1200, Los Angeles, CA 90015 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at ZWEIBACK, FISET & ZALDUENDO LLP, 315 W. 9th Street, Suite 1200, Los Angeles, CA 90015.

☐ BY FEDERAL EXPRESS  ☐ UPS NEXT DAY AIR  ☐ OVERNIGHT DELIVERY: I deposited such envelope in a facility regularly maintained by  FEDERAL EXPRESS  ☐ UPS  ☐ Overnight Delivery [specify name of service: ] with delivery fees fully provided for or delivered the envelope to a courier or driver of  ☐ FEDERAL EXPRESS  ☐ UPS  ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at ZWEIBACK, FISET & ZALDUENDO LLP, 315 W. 9th Street, Suite 1200, Los Angeles, CA 90015 with delivery fees fully provided for.

☒ By E-Service: I submitted an electronic version of this document and exhibits, if any, via PDF to all parties via email.

☒ [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ [Federal] I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2024, at Los Angeles, California.

*Leslie Becerra*

Leslie Becerra

1

## <u>SERVICE LIST</u>

2

3

**THE PEOPLE OF THE STATE OF CALIFORNIA v. FRED MINASSIAN**
United State District Court Central District of California, Case No. 2:17-CR-00480-psg-6

| | |
|---|---|
| Brittney Michelle Harris<br>AUSA - Office of US Attorney<br>General Crimes Section<br>312 North Spring Street Suite 1200<br>Los Angeles, CA 90012<br>Phone: 213-894-0488<br>Fax: 213-894-0141<br>Email: brittney.harris@usdoj.gov | Attorneys for Plaintiff |
| Jehan M. Pernas<br>AUSA - Intl Narcotics, Money Laundering,<br>and Racketeering Section<br>312 North Spring Street, Suite 1200<br>Los Angeles, CA 90012<br>Phone: 213-894-0319<br>Fax: 213-894-0141<br>Email: jehan.pernas@usdoj.gov | Attorneys for Plaintiff |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28